47 A.3d 1113

Bashawn Montgomery RAY

v.

STATE of Maryland.

No. 1444, Sept. Term, 2011.

Court of Special Appeals of Maryland.

July 2, 2012.

---

310

Nancy S. Forster, Towson, MD, for Appellant.

Todd W. Hesel (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: WATTS, BERGER, JAMES R. EYLER, (Retired, Specially Assigned) JJ.

WATTS, J.

On April 18, 2011, based on a not guilty agreed statement of facts, the Circuit Court for Montgomery County convicted Bashawn Montgomery Ray, appellant, of conspiracy to commit theft of property with a value of at least $1,000 and making a false statement when under arrest.[1] *See* Md.Code. Ann., Crim. Law Art. (C.L.) § 7–104 (theft of property with a value of at least $1,000),[2] C.L. § 9–502 (making a false statement when under arrest). On August 11, 2011, the circuit court sentenced appellant to ten years' imprisonment concurrent with pre-existing sentences, with all but four years suspended, for conspiracy to commit theft; six months' imprisonment concurrent for making a false statement when under arrest; and four years' supervised probation. Appellant noted an appeal raising two issues, which we rephrase: [3]

I. A Did the circuit court err in finding that Sergeant Mark White had reasonable articulable suspicion to initiate a traffic stop of the vehicle in which appellant was a passenger?

---

1. The State entered a *nolle prosequi* as to the charges of theft and identity fraud.

2. In Maryland, conspiracy is a common law crime, and thus is not codified in the Annotated Code of Maryland. *See Rudder v. State,* 181 Md.App. 426, 432–34, 956 A.2d 791 (2008) (This Court defined conspiracy.).

3. Appellant phrased the issues as follows:
 I. Did the [circuit] court err in denying [appellant]'s motion to suppress?
 II. Was [appellant]'s jury trial waiver made knowingly and intelligently as required by Maryland Rule 4–246[ (b) ]?
 At oral argument, as to question II, appellant submitted on brief.

 B. Did the circuit court err in finding that law enforcement officers had probable cause to arrest appellant?

 II. Did the circuit court err in determining that appellant knowingly waived the right to a jury trial, or in failing to announce its determination on the record pursuant to Maryland Rule 4–246(b)?

We answer both questions in the negative, and therefore, affirm the judgments of conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

### Motion to Suppress

On January 31, 2011, appellant filed with the circuit court a Supplement to Omnibus Motion to Suppress Evidence, in which appellant moved "to suppress all evidence obtained as a result of an illegal traffic stop and illegal detention and search on or about October 5, 2010[.]" The motion stated, in pertinent part:

[T]he Police Officers had no reasonable articulable suspicion that a traffic violation had occurred and therefore no legal basis to stop the vehicle. *Whren v. [United States ]*, 517 U.S. 806 [116 S.Ct. 1769, 135 L.Ed.2d 89] (1996), *Rowe v. State*, 363 Md. 424 [769 A.2d 879] (2001).

[Appellant] has standing to challenge the illegal stop of the vehicle. *Brendlin v. California*, 551 U.S. 2[4]9 [127 S.Ct. 2400, 168 L.Ed.2d 132] (2007).

[A]fter the vehicle was stopped, the Officer determined that the vehicle's driver had a suspended license. The driver was taken to the officer's vehicle where he was issued traffic citations. After the citations were written, the passengers in the vehicle were illegally detained. *Ferris v. State*, 355 Md. 356 [735 A.2d 491] (1999).

[ ] The detention of the passengers was [a] "second stop." The Officers had no independent reasonable articulable suspicion of criminal activity to detain the passengers after making the decision to issue the driver traffic citations. *Charity v. State*, 132 Md.App. [598, 753 A.2d 556, *cert. denied*, 360 Md. 487, 759 A.2d 231] (2000).

## Suppression Hearing as to the Initial Traffic Stop

On February 1, 2011, the circuit court held a hearing on the motion to suppress. As a witness for the State, Sergeant Mark White testified that on October 5, 2010, he was driving a marked police vehicle north on Interstate 270 in Montgomery County. Sergeant White testified that he passed a black Ford Expedition that, he noticed in his rearview mirror, had headlamps that "were emitting a blue color which caught [his] attention[.]" Sergeant White testified that "the blue tint could've very well been halogen lights. There was no way for [him] to determine that unless [he] got up in front of the" headlamps. Sergeant White testified that he was aware of a statute that mandated white headlamps.[4] Sergeant White testified that he initiated a traffic stop, and after checking the Expedition's license plate number through the Motor Vehicle Administration and the National Crime Information Center, learned that the Expedition's owner, Antoine Norris, had a suspended driver's license due to a child support violation.

Sergeant White was the only witness for the State at this stage of the motion hearing. After Sergeant White testified, the circuit court heard argument and ruled from the bench, in pertinent part, as follows:

> The standard is whether an officer, a reasonable police officer in the situation that the officer is in, can articulate reasonable, articulable suspicion and develop probable cause for a traffic stop. And it doesn't have to make sense to the Court, it doesn't have to make sense to counsel, but in the officer's situation, he sees a car going down the road, it's got blue lights. The law says you can't have blue lights; it says you have to have white lights.
>
> And then he gets up close and he says—I think it's a reasonable inference from his testimony even though he wasn't, there was no attempt to nail him down on this. I learned something about it. I didn't realize that halogen lights have a bluish tint; I didn't know that. But apparent-

---

4. *See* Md.Code Ann., Transp. Art. § 22–203, *infra.*

ly the officer knows that the halogen lights may have a bluish tint and he say[s], upon close[r] examination, I mean they couldn't have been halogen lights. I think a reasonable inference is, obviously, halogen lights are not illegal so far as I know. But how could you know that without closer examination?

\* \* \*

And so for reasons that I hope I have articulated clearly, I don't find that there was a lack of probable cause for making the traffic stop, so the motion to suppress for that reason would necessarily be denied.

### Suppression Hearing as to the Search

After the circuit court ruled as to the initial traffic stop, Sergeant White testified that he approached the Expedition to speak with Norris, the Expedition's owner, who was sitting in the driver's seat. According to Sergeant White, Norris gave him an expired learner's permit. Sergeant White testified that he asked Norris to exit the Expedition. According to Sergeant White, Norris complied and sat in his marked police vehicle while the two of them had a conversation. Sergeant White testified that he wrote three citations for Norris—two for driving with a suspended license, and one for driving with an obstructed windshield. Sergeant White testified that he intended to search the Expedition because of Norris's suspended license, and that he intended not to let Norris continue driving.

During Sergeant White's conversation with Norris in the marked police vehicle, three other law enforcement officers arrived. Sergeant White testified that one of the other law enforcement officers, Officer Robert Sheehan, asked the passengers in the Expedition to exit the vehicle.

As a witness for the State, Officer Sheehan testified that in October 2010, he learned via radio that Sergeant White was initiating a traffic stop. Officer Sheehan testified that he pulled up behind Sergeant White's marked police vehicle before he walked up to the driver's window of the black SUV,

whose driver's seat was empty. Officer Sheehan testified that he started a conversation with the vehicle's passengers and asked where the passengers were coming from and where they were going. According to Officer Sheehan, **after every question that he asked, the passengers would "all look at each other and then one of them would respond with an answer."** (Emphasis added). Officer Sheehan testified that he "was having some difficulty hearing them because of the way traffic was going by." Officer Sheehan testified that, because of his difficulty hearing and the passengers' behavior, he asked them to exit the vehicle.

According to Officer Sheehan, the two passengers in the backseat.[5] "immediately" exited the vehicle, but the female passenger in the front seat—whom the not guilty agreed statement of facts identified as Mashea Ray ("Mashea")— "started moving around and reaching for stuff, which [made Officer Sheehan] very nervous." Officer Sheehan testified that he "didn't know if she was trying to access a weapon of some sort. So [he] asked her once again to get out of the vehicle. She didn't get out of the vehicle." Officer Sheehan testified that he walked around to the vehicle's passenger side and once again asked Mashea exit the vehicle. According to Officer Sheehan, Mashea said that it was "cold out; [she] need[ed] to grab [her] jacket." Officer Sheehan testified that Mashea **"grabbed her jacket from the floor that was directly behind her seat"** before starting to exit the vehicle. (Emphasis added).

Officer Sheehan testified that he asked Mashea "if there were any weapons in her jacket[,]" and that Mashea replied "no." Officer Sheehan asked Mashea if he could search the jacket to make sure, and Mashea replied "yes." Officer Sheehan found a "large wallet," which he removed from the jacket. Officer Sheehan asked Mashea if it was her wallet, and she replied "yes." Officer Sheehan asked if Mashea's identification was in the wallet, and she replied "no." Officer

---

5. The not guilty agreed statement of facts established that the backseat's two passengers were appellant and an unknown "juvenile female[.]"

Sheehan asked if he could search the wallet to make sure, and Mashea "said something to the effect of yeah, it[ was] not in there." Officer Sheehan testified that, he "saw a whole stack of credit cards inside the wallet that to [him] appeared to be fake credit cards. [He] starting pulling them out and one by one[, and he would] say the name on the credit card and [ ] ask [Mashea], who's this person?" According to Officer Sheehan, every time that he showed a credit card to Mashea, "she said she didn't know" who the person was whose name was on the credit card.

After Officer Sheehan testified, the prosecutor argued, in pertinent part, as follows:

[W]e concede that the officers did not have-because the decision had been made to issue the citations, under *Knowles v. Iowa,* the officers could not do a search incident to an arrest.

So, although Officer White or Sergeant White articulated that's what he was thinking at the time, we concede legally he couldn't have done that at that point.[6]

\*　　\*　　\*

[T]he State's argument is they [the law enforcement officers] have to get these people [Norris, appellant, Mashea, and the unknown juvenile female] out of there because we're stuck on [Interstate] 270, as the *Timmons* [*v. State,* 114 Md.App. 410, 690 A.2d 530 (1997) ] case notes. Sometimes you're in those situations where you have something that looks like a seizure but is not actually a seizure because of the circumstances.

Once that non-seizure, if you will, occurs and [appellant] is asked out of the car with the female, what happens next is a variety of consent things with the female, which we already, he [appellant] has no standing to contest. That leads to what are readily apparent fraudulent credit cards.

---

6. *See infra* footnote 14.

And at that point, just as if drugs had been discovered, they've got probable cause to arrest everybody.

(Emphasis added).

After hearing argument, the circuit court ruled from the bench, in pertinent part, as follows:

[T]his was good police work. People do things sometimes thinking that they have to give the police consent. They think, she [Mashea] probably thought she had to say you can search my jacket. She didn't have to say that; she could've said no, give me my jacket, you're not searching my jacket. But she said oh yeah, go ahead. You can do it.

\* \* \*

[T]here's no challenge that the consent that she [Mashea] gave was not valid consent.

\* \* \*

[S]earches of persons or places or automobiles without a warrant are presumed to be unreasonable, unless there is some carefully articulated exception to the warrant requirement. And I find you have such an articulated exception here. You have an intervening cause that essentially interrupted what was about to be an illegal search.

\* \* \*

So I think this illegal search was interrupted by the consent search of the young woman [Mashea] who had contraband on her, and then of course, **once the police discover contraband, they're not going to ignore that.**

And so for reasons that I've probably articulated, perhaps ad nauseam, the motion to suppress will be denied.

(Emphasis added).

### Not Guilty Agreed Statement of Facts Hearing

On April 18, 2011, the circuit court accepted appellant's plea of not guilty with an agreed statement of facts. Prior to the court's acceptance of the plea, the following exchange occurred:

[APPELLANT'S COUNSEL]: And I do have the advice of rights form that [appellant] has signed—

THE COURT: All right, thank you.

[APPELLANT'S COUNSEL]: I've signed as well. I have crossed out a number of items that deal with the appeal issues because he would maintain his appeal rights—

THE COURT: Okay.

[APPELLANT'S COUNSEL]: Based on the not guilty agreed statement of facts.

THE COURT: All right, sir, [appellant], **you've gone over the rights that you give up when you enter a plea of guilty** [7] **in a criminal case with your lawyer, correct, sir?**

[APPELLANT]: **Yes,** sir.

THE COURT: **And you've discussed them with him, you understand what they are, and you have signed this advice of rights form, correct, sir?**

[APPELLANT]: **Yes,** sir.

THE COURT: All right. **Mr. State, are you satisfied that this matter is being, this plea is being entered voluntarily with full awareness of potential consequences?**

[PROSECUTOR]: **Yes,** Your Honor.

THE COURT: All right, thank you. Mr. State, even though I have a memorandum of the agreed facts in this case and the elements of the offense, would you state them for the record?

[PROSECUTOR]: Yes.

[APPELLANT'S COUNSEL]: If I could just interrupt.

THE COURT: Yes.

---

**7.** A not guilty agreed statement of facts is not the functional equivalent of a guilty plea where a defendant pleads not guilty to preserve for appellate review a trial court's denial of a motion to suppress. *See Ward v. State,* 52 Md.App. 664, 672–73, 451 A.2d 1243 (1982). For purposes of the instant appeal, however, the circuit court's use of the term "a plea of guilty" is not relevant because, regardless of whether appellant pled guilty or proceeded by way of a not guilty agreed statement of facts, appellant waived the right to a jury trial.

[APPELLANT'S COUNSEL]: I don't know that we put the terms of the plea actually on the record.

THE COURT: The terms of the plea are that [appellant] agrees to proceed by way of an agreed statement of facts on Count 1, amended to allege conspiracy to commit theft of property having a value of at least $1,000 but less than $10,000.

And on Count 4, alleging false statement when under arrest. There's a cap of four years un-executed incarceration. The State will enter a nolle prosequi to Counts 2 and 3 at sentencing, and the State will defer to the Court as to [appellant]'s bond status between the date of trial and the date of sentencing.

[Appellant] will waive any right under Maryland [R]ule 4–345(e) to request a modification of his sentence.

Are those the complete terms of the agreement?

[APPELLANT'S COUNSEL]: They are, Your Honor. [Appellant], understanding those terms of the agreement—

Are those the terms of the plea agreement that you and I discussed?

[APPELLANT]: Yes. What was it about the bond issue?

[APPELLANT'S COUNSEL]: The bond is that the State's not going to be asking to have your bond revoked—

[APPELLANT]: Okay.

(Emphasis added).

The above-referenced advice of rights form—which contains appellant's name ("Bashawn Ray Montgomery"), address, and date of birth—was entered into evidence as an attachment to the not guilty agreed statement of facts. A checkmark in ink appears next to each of the following items on the advice of rights form:

1. What is your name? ["Bashawn Montgomery" is hand-written here.]

2. State your address, occupation, and age. How far did you go in school? Do you read, speak, and understand English?

3. By proceeding in a guilty plea, you are giving up your right to contest the evidence. If you were to proceed to trial, I would have the opportunity of making additional motions, such as a motion to suppress, to exclude certain statements, to exclude certain questions from the testimony, to challenge a search or seizure, and to request that the Judge instruct the jury in certain ways as to the law of the case.

\* \* \*

10. Do you realize that by entering a plea of guilty that you are waiving all possible defenses that you might have to the charges?

11. Are you under the influence of any drug, alcohol, or medication prescribed by a doctor?

\* \* \*

20. **Do you realize that you are entitled to go to trial before a jury?**

21. Are you voluntarily waiving your constitutional right to a jury trial?

22. **Do you understand that if you wish to go to trial before a jury, the jury would consist of twelve persons unless you agree to a lesser number, selected at random by a computer from the voter rolls of this community?**

23. **Do you know that if you chose to be tried before a jury, all twelve members of that jury would have to find you guilty beyond a reasonable doubt before you could be convicted? You understand their verdict must be unanimous, which means that they must all agree?**

24. **Do you know that if you waive your right to a trial before a jury, and elect to go to trial before a judge, you can be convicted if the judge finds you guilty beyond a reasonable doubt?**

25. Do you understand that if you went to trial either before a jury or a judge, the State's [A]ttorney would have to bring witnesses into open court to testify against you?

26. Do you understand that if you went to trial, you or your attorney could cross examine, or question, any person who has evidence against you?

27. Do you understand that if you went to trial either before a jury or a judge, you would have a right to remain silent, and that if you chose to remain silent it could not be held against you in any way; that no one could comment on your silence, and no one could infer any guilt[ ] from your silence?

(Emphasis added). Appellant's signature and the date, as well as appellant's counsel's signature and the date, appear at the bottom of the document.

A separate document bearing appellant's signature was entered into evidence as an attachment to the not guilty agreed statement of facts. The untitled document reads:

*Defendant's Acceptance*

I have read each page of the agreed statement of facts and have discussed it with my attorney, [appellant's counsel]. **I fully understand these facts and agree that, if the facts were believed by a jury, the facts are sufficient [to] support a finding of guilt.** I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this document fully.

Date: 4/18/11 [Appellant's signature]
 Bashawn Ray
 Defendant

(Emphasis added).

Appellant and the State agreed that the complete testimony of Sergeant White and Officer Sheehan from the suppression

hearing would be incorporated into the not guilty agreed statement of facts. The State read into the record the not guilty agreed statement of facts, which established that law enforcement officers had determined that the credit cards from the wallet were "counterfeited." The not guilty agreed statement of facts demonstrated that some of the counterfeited credit cards bore the name "Robert Smith[.]" According to the not guilty agreed statement of facts, the name "Robert Smith" also appeared on a fraudulent identification card with appellant's photograph that had been found on the unknown juvenile female who had been a passenger in the Expedition. The not guilty agreed statement of facts established that the counterfeited credit cards had been used to purchase Nordstrom gift cards, one of which appellant used on October 4, 2010, to purchase merchandise at Nordstrom. According to the not guilty agreed statement of facts, the Expedition in which appellant had been a passenger on October 5, 2010, contained Nordstrom shopping bags with merchandise therein, of which appellant claimed ownership. After appellant was arrested, "[w]hile at the police station, [appellant] claimed his name was Daylin Seymour on numerous occasions.... Only after [appellant] had been processed by the Commissioner was it determined that [appellant]'s true name was Bashawn Ray."

After the State's reading of the not guilty agreed statement of facts, the following exchange occurred:

THE COURT: Any additions, modifications or corrections?

[APPELLANT'S COUNSEL]: No, Your Honor. We agree that's the evidence the State would've put forward. I would make a motion for judgment of acquittal and submit, and we rest.

THE COURT: Very well. The motion for judgment of acquittal is denied. The Court finds that there is a sufficient factual predicate in the statement of facts upon which the parties agree.

## DISCUSSION

### I.

### A. Reasonable Articulable Suspicion to Initiate the Traffic Stop

#### (1) Contentions

Appellant contends that the circuit court erred in finding that Sergeant White had reasonable articulable suspicion to stop the Expedition in which appellant was a passenger. Appellant argues that the circuit court "concluded that Sergeant White could not [have known] that the headlights were lawful halogen lights until *after* he conducted the stop. This is akin to saying that the officer could stop the Expedition because it may or may not have had unlawful headlight equipment." (Emphasis in original). Appellant asserts that "Sergeant White's belief that the headlights may or may not have emitted an unlawful color ... amount[ed] to nothing more than a hunch[.]"

The State responds that Sergeant White had reasonable articulable suspicion to initiate the traffic stop of the Expedition in which appellant was a passenger. The State contends that "Sergeant White needed only reasonable [articulable] suspicion, and not absolute certainty, of a traffic violation in order to properly stop the Expedition." The State argues that "Sergeant White's observation that the headlights 'were emitting a blue color' was sufficient to supply" reasonable articulable suspicion. The State points out that neither Section 22–203 of the Transportation Article of the Annotated Code of Maryland nor Section 11.14.02.10A(e) of the Code of Maryland Regulations (also known as COMAR) provides an exception permitting halogen lights.

#### (2) Standard of Review

In *Smith v. State,* 182 Md.App. 444, 455, 957 A.2d 1139 (2008), this Court explained the standard of review as to motions to suppress generally and as to reasonable articulable suspicion specifically. The Court stated:

Our review of the [trial] court's denial of a motion to suppress is based on the record created at the suppression hearing and is a mixed question of law and fact. An appellate court reviews the trial court's findings of fact only for clear error, giving due weight to the inferences fairly drawn by the trial court and viewing the evidence and inferences reasonably drawn therefrom in a light most favorable to the prevailing party on the motion. However, legal conclusions are not afforded deference and thus are reviewed *de novo.* This Court reviews *de novo* the conclusions of the trial court as to whether reasonable, articulable suspicion justified a traffic stop, as this is a question of law.

*Id.* (citations omitted).

An appellate court "undertake[s its] own independent constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case." *Prioleau v. State,* 411 Md. 629, 638, 984 A.2d 851 (2009) (citations and internal quotation marks omitted).

### (3) Law

### (a) Reasonable Articulable Suspicion to Initiate a Traffic Stop

In *Herring v. State,* 198 Md.App. 60, 73, 16 A.3d 246 (2011), this Court explained that traffic stops [8] are subject to the Fourth Amendment's reasonableness requirement. This Court stated:

The Fourth Amendment to the Constitution of the United States, made applicable to the States through the Fourteenth Amendment, guarantees, *inter alia,* "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." When an automobile and its occupants are stopped by police, the resulting detention constitutes a "seizure" within the meaning of the Fourth and Fourteenth Amendments to the

---

8. Traffic stops are also known as *Terry* stops, named after *Terry v. Ohio,* 392 U.S. 1, 30–31, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

federal constitution, even though the purpose of the stop is limited and the resulting detention quite brief.

*Id.* (citations and some internal quotation marks omitted).

 "A traffic stop is justified under the Fourth Amendment where the police have a reasonable suspicion supported by articulable facts that criminal activity is afoot." *Lewis v. State*, 398 Md. 349, 361, 920 A.2d 1080 (2007) (citations omitted). Reasonable articulable suspicion is "a less demanding standard than probable cause." *Bailey v. State*, 412 Md. 349, 368 n. 6, 987 A.2d 72 (2010) (citation and internal quotation marks omitted). "In determining the existence of reasonable suspicion, a court must consider the totality of the circumstances—the whole picture. [The Court] do[es] not parse an officer's overall concern and base a judgment on whether its individual components, standing alone, will suffice." *McDowell v. State*, 407 Md. 327, 337, 965 A.2d 877 (2009) (citations and internal quotation marks omitted).

 A traffic stop is valid if it is based on "reasonable articulable suspicion to believe the car is being driven contrary to the laws governing the operation of motor vehicles[.]" *Smith*, 182 Md.App. at 462, 957 A.2d 1139 (citation and internal quotation marks omitted). In *Lewis*, 398 Md. at 363, 920 A.2d 1080, the Court of Appeals listed examples of such violations of motor vehicle laws, stating:

[T]he police have the right to stop and detain the operator of a vehicle when they witness a violation of a traffic law. *See, e.g., Byndloss v. State*, 391 Md. 462, 481, 893 A.2d 1119, 1130–31 (2006) ("[The law enforcement officer] conducted a lawful stop of [the vehicle] in which [the defendant] was the front seat passenger, after observing that the [vehicle]'s license plate was obscured by a plastic license plate cover [in violation of Section 13–411 of the Transportation Article]."); [*State v.*] *Green*, 375 Md. [595], 614 [826 A.2d 486 (2003) ] ("In the case *sub judice*, like in *Ferris*, the parties do not dispute that [the law enforcement officer] stopped [the defendant] because he had probable cause to believe [that the defendant] had violated the law by exceeding the

posted speed limit."); *State v. Wallace*, 372 Md. 137, 141, 812 A.2d 291, 294, 296 (2003)[, *cert. denied*, 540 U.S. 1140, 124 S.Ct. 1036, 157 L.Ed.2d 951 (2004) ] (stating that it was agreed that [a traffic] stop was justified after [a law enforcement] officer witnessed [a] vehicle exceed [the] speed limit and run a red light); *Nathan* [*v. State* ], 370 Md. [648] 661 [805 A.2d 1086 (2002), *cert. denied*, 537 U.S. 1194, 123 S.Ct. 1303, 154 L.Ed.2d 1029 (2003) ] (determining that [a traffic] stop was justified after [a law enforcement] officer witnessed [a] vehicle [that was] speeding on a public highway); *Wilkes v. State*, 364 Md. 554, 572, 774 A.2d 420, 431 (2001) (finding that [a traffic] stop was justified for [a] vehicle [that was] exceeding the posted speed limit); *Ferris* [*v. State* ], 355 Md. [356], 369 [735 A.2d 491 (1999) ] ("It is without dispute that the stop of [the defendant] by [the law enforcement officer] for exceeding the posted speed limit constituted a seizure for Fourth Amendment purposes, but that such a seizure was justified by the probable cause possessed by the [law enforcement officer] in having witnessed [the defendant]'s traffic violation."); *Derricott v. State*, 327 Md. 582, 584, 611 A.2d 592, 594 (1992) ( [A traffic] stop [was] justified when [a law enforcement] officer witnessed [a] vehicle [that was] traveling 89 miles per hour in [a] 55 miles per hour zone).

(One alteration in original).

### (b) Statutes and Regulation as to Proper Headlamps on Vehicles

Section 22–101(a)(1)(ii) of the Transportation Article of the Annotated Code of Maryland provides, in pertinent part:

A person may not drive . . . on any highway any vehicle . . . that[ ] . . . [d]oes not contain those parts or is not at all times equipped with lamps and other equipment in proper condition and adjustment as required in this title[.]

Section 22–203(b) of the Transportation Article of the Annotated Code of Maryland provides, in pertinent part:

Every motor vehicle . . . shall be equipped with at least two headlamps with at least one on each side of the front of the motor vehicle, which **headlamps shall emit white light**[.] (Emphasis added). COMAR 11.14.02. 10A(e) instructs vehicle inspectors to reject a vehicle if "[a]ny lamp shows color contrary to law (red or **blue to the front,** white light to the rear)[.]" (Emphasis added).

### (4) Analysis—Reasonable Articulable Suspicion to Initiate the Traffic Stop

▮▮▮▮ Returning to the instant case, we conclude that Sergeant White had "reasonable articulable suspicion to believe the [Expedition in which appellant was a passenger was] being driven contrary to the laws governing the operation of motor vehicles." *Smith,* 182 Md.App. at 462, 957 A.2d 1139. Sergeant White believed that the Expedition had headlamps that emitted blue light in violation of Section 22–203(b) of the Transportation Article of the Annotated Code of Maryland, which mandates that headlamps emit white light.[9] A violation of the Transportation Article's statutes, even those that concern a vehicle's equipment rather than moving violations, provides reasonable articulable suspicion to initiate a traffic stop. *See Byndloss,* 391 Md. at 481, 893 A.2d 1119 (The Court of Appeals held that a law enforcement officer had reasonable articulable suspicion to initiate a traffic stop where a vehicle's license plate was obscured.). That Sergeant White did not cite Norris for illegal headlamps is not relevant because reasonable articulable suspicion turns on what the law enforcement officer observed **prior** to the initial traffic stop, not what the law enforcement officer did **after** the initial traffic stop. *See State v. Williams,* 401 Md. 676, 686, 934 A.2d 38 (2007) (A

---

**9.** On brief, appellant argues that Sergeant White lacked reasonable articulable suspicion to initiate a traffic stop because Sergeant White could not have been certain as to whether the Expedition's headlamps were halogen lights, which, according to the circuit court, "are not illegal as far as I know." But regardless of whether or not the Expedition's headlamps were halogen lights, Sergeant White believed that they emitted blue light—thus violating Section 22–203(b) of the Transportation Article of the Annotated Code of Maryland.

court should "judge[ ] the conduct of the officer based . . . on what was reasonably apparent **at the time of the stop[.]**" (Emphasis added)).[10] For all the reasons discussed above, we are satisfied that Sergeant White had reasonable articulable suspicion to initiate the traffic stop.[11]

## B. Probable Cause to Arrest Appellant

### (1) Contentions

Appellant contends that the circuit court erred in holding that law enforcement officers had probable cause to arrest

---

**10.** On brief, appellant alleges that Sergeant White admitted that the Expedition's headlamps did not violate any part of the traffic code and that he did not issue a repair order. Appellant bases these allegations on the following exchange:

> [APPELLANT'S COUNSEL]: Now with regard to the lights, you did not issue a traffic citation for any type of illegal traffic light under the traffic code, is that correct?
>
> [SERGEANT WHITE]: No, sir.
>
> [APPELLANT'S COUNSEL]: So would you agree with me there was no actual, in the Maryland traffic code, there was no violation that was committed with regards to the lights?
>
> [SERGEANT WHITE]: It would be a repair order.

This exchange establishes only that Sergeant White did not cite Norris for the illegal headlamps. Contrary to appellant's allegations, Sergeant White did not admit that the Expedition's headlamps did not violate any part of the traffic code or that he did not issue a repair order.

More importantly, that Sergeant White supposedly did not issue a repair order is not relevant because reasonable articulable suspicion turns only on what the law enforcement officer observed **prior** to the initial traffic stop, not what the law enforcement officer did **after** the initial traffic stop. See Williams, 401 Md. at 686, 934 A.2d 38. That the headlamps supposedly were not illegal and that they supposedly merited only a repair order is not relevant because the "the State has no . . . burden of proving a violation to justify an officer's action at the initial investigatory stage . . . . [T]he fundamental purpose of a Terry-stop, based as it is on reasonable[ articulable] suspicion, is to confirm or to dispel that suspicion[.]" Muse v. State, 146 Md.App. 395, 406, 807 A.2d 113 (2002) (emphasis in original) (citation and internal quotation marks omitted).

**11.** Because probable cause is a "higher standard" than reasonable articulable suspicion, Williams, 401 Md. at 695, 934 A.2d 38, the circuit court, by definition, found that Sergeant White had reasonable articulable suspicion to initiate the traffic stop by finding that Sergeant White had probable cause to initiate the traffic stop.

him. Appellant argues that this "case is easily distinguishable from *Pringle* and is more closely aligned with *Di Re* [because] the counterfeit[ed] credit cards were inside a personal wallet, which was inside a personal jacket both of which belonged to [Mashea] and was not 'accessible to all.'" Appellant asserts that because Mashea "claimed sole ownership of both the jacket and the wallet[, her] admission that the contraband belong[ed] to [her] may dissipate any probable cause" to arrest the remaining passengers. (Citation and emphasis omitted). Appellant maintains that [Mashea]'s "actions were consistent with her sole ownership [because both] of the [other passengers], including [appellant], immediately got out of the Expedition when ordered to do so; however, [Mashea] had to be told three times to get out of the [Expedition], indicating that she had something to hide." Appellant contends that he "had no dominion or control over [Mashea's] personal belongings[.]" Appellant concedes that, "where it is reasonable for police to believe a common enterprise to commit a crime exists among passengers in a car, there is probable cause to arrest all of the passengers." Appellant argues, however, that "mere proximity to or association with one suspected of a crime does not provide probable cause to arrest." Appellant asserts that, unlike drug dealing, credit card counterfeiting "is not so open a crime that passengers in the same vehicle would necessarily be engaged in a joint criminal enterprise particularly when those credit cards are kept in the personal wallet inside the coat of another passenger."

The State responds that appellant's argument "is pure appellate afterthought that has no basis in the record and should not be addressed." The State contends that appellant's "arrest was a non-issue at the suppression hearing" because "[t]here was no testimony about [appellant]'s arrest[.]" The State argues that the circuit "court did not address [appellant]'s arrest, and [appellant's] counsel did not argue as grounds for the motion [to suppress] that [appellant] was arrested without probable cause." The State asserts that "it would be patently unfair to reverse the [circuit] court based on an argument that neither the State nor the [circuit] court had

any occasion to address, and that the record does not support." Alternatively, the State maintains that appellant's "argument is deficient on its face because it makes no connection (and the record does [not] establish any connection) between his supposedly unlawful arrest and the evidence he wishes to suppress[.]" The State does not address the merits of appellant's argument concerning probable cause.

In a reply brief, appellant contends that the issue of probable cause to arrest him is preserved for appellate review because the circuit court found that when law enforcement officers discovered the counterfeited credit cards in the wallet, they had probable cause to arrest all of the passengers. Alternatively, appellant argues that "the question of whether [law enforcement officers] had probable cause to arrest [appellant] is sufficiently interrelated with the argument made by defense counsel that this Court should treat them as if both were raised." Appellant asserts that there was a connection between his arrest and the evidence to be suppressed because the discovery of the Nordstrom shopping bags in the vehicle and his statement to law enforcement officers, claiming ownership of the bags, occurred after the arrest.

## (2) Standard of Review

In *Ornelas v. United States,* 517 U.S. 690, 697, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), the Supreme Court explained the standard of review as to probable cause determinations, stating:

We think independent appellate review of these ultimate determinations of reasonable suspicion and probable cause is consistent with the position we have taken in past cases. We have never, when reviewing a probable-cause or reasonable-suspicion determination ourselves, expressly deferred to the trial court's determination. A policy of sweeping deference would permit, in the absence of any significant difference in the facts, the Fourth Amendment's incidence [to] tur[n] on whether different trial judges draw general conclusions that the facts are sufficient or insufficient to constitute probable cause.

. . .

We therefore hold that as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal.

(Alterations in original) (citations and internal quotation marks omitted).[12]

### (3) Law—Probable Cause for Warrantless Arrests After Traffic Stops

Although probable cause is a "higher standard" than reasonable articulable suspicion, *Williams,* 401 Md. at 695, 934 A.2d 38, "the kinds and degree of proof and the procedural requirements necessary for a conviction are not prerequisites to a valid arrest." *Diehl v. State,* 294 Md. 466, 484, 451 A.2d 115 (1982), *cert. denied,* 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 363 (1983) (citation omitted). In *Longshore,* 399 Md. at 501, 924 A.2d 1129, the Court of Appeals explained probable cause for a warrantless arrest. The Court stated:

> A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in an officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause.
>
> ... [P]robable cause exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed [by the person to be arrested].

*Id.* (alterations in original) (omission added) (citations and internal quotation marks omitted).

---

**12.** In *Longshore v. State,* 399 Md. 486, 527, 924 A.2d 1129 (2007), discussing *Pringle, infra,* and *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Court of Appeals remarked:

> A trial court's probable cause determination is entitled to deference, and, if the appellate court determines that there is a substantial basis for the trial court to have concluded, as it did, that there was probable cause, the trial court's determination will not be disturbed. If, on the other hand, the appellate court concludes that there is no such basis, then there is no probable cause.

(Citations omitted).

In *Maryland v. Pringle,* 540 U.S. 366, 374, 368, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), the Supreme Court held that a law enforcement "officer had probable cause to believe that [the defendant] had committed the crime of possession of a controlled substance" where, during a consent search of a vehicle in which the defendant was a passenger, the law enforcement officer discovered controlled substances. Even though the defendant denied owning the drugs, the law enforcement officer had probable cause to arrest him. *Id.* at 368, 374, 124 S.Ct. 795. The Court stated:

> In this case, [the defendant] was one of three men riding in a Nissan Maxima at 3:16 a.m. There was $763 of rolled-up cash in the glove compartment directly in front of [the defendant]. **Five plastic glassine baggies of cocaine were behind the back-seat armrest and accessible to all three men.** Upon questioning, the three men failed to offer any information with respect to the ownership of the cocaine or the money.
>
> We think it an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine. Thus a reasonable officer could conclude that there was probable cause to believe [the defendant] committed the crime of possession of cocaine, either solely or jointly.
>
> **[The defendant]'s attempt to characterize this case as a guilt-by-association case is unavailing.** His reliance on *Ybarra v. Illinois,* [444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)], and *United States v. Di Re,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), is misplaced. In *Ybarra,* police officers obtained a warrant to search a tavern and its bartender for evidence of possession of a controlled substance. Upon entering the tavern, the officers conducted patdown searches of the customers present in the tavern, including Ybarra. Inside a cigarette pack retrieved from Ybarra's pocket, an officer found six tinfoil packets containing heroin. We stated:
>
>> [A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give

rise to probable cause to search that person. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.

We held that the search warrant did not permit body searches of all of the tavern's patrons and that the police could not pat down the patrons for weapons, absent individualized suspicion.

This case is quite different from *Ybarra* [. The defendant] and his two companions were in a relatively small automobile, not a public tavern. In *Wyoming v. Houghton,* 526 U.S. 295, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999), we noted that **a car passenger**—unlike the unwitting tavern patron in *Ybarra*—**will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing. Here we think it was reasonable for the officer to infer a common enterprise among the three men.** The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.

In *Di Re,* a federal investigator had been told by an informant, Reed, that he was to receive counterfeit gasoline ration coupons from a certain Buttitta at a particular place. The investigator went to the appointed place and saw Reed, the sole occupant of the rear seat of the car, holding gasoline ration coupons. There were two other occupants in the car: Buttitta in the driver's seat and Di Re in the front passenger's seat. Reed informed the investigator that Buttitta had given him counterfeit coupons. Thereupon, all three men were arrested and searched. After noting that the officers had no information implicating Di Re and no information pointing to Di Re's possession of coupons, unless presence in the car warranted that inference, we con-

cluded that the officer lacked probable cause to believe that Di Re was involved in the crime. We said [a]ny inference that everyone on the scene of a crime is a party to it must disappear if the Government informer singles out the guilty person. **No such singling out occurred in this case; none of the three men provided information with respect to the ownership of the cocaine or money.**

*Pringle*, 540 U.S. at 371–74, 124 S.Ct. 795 (emphasis added) (some alterations in original) (footnote, internal quotation marks, and some citations omitted).

In *Houghton*, 526 U.S. at 304–05, 119 S.Ct. 1297 the Supreme Court explained that the government has a substantial interest in cases that involve searches of vehicles. The Court stated:

Whereas the passenger's privacy expectations are, as we have described, considerably diminished, the governmental interests at stake are substantial. **Effective law enforcement would be appreciably impaired without the ability to search a passenger's personal belongings when there is reason to believe contraband or evidence of criminal wrongdoing is hidden in the car.** As in all car-search cases, the "ready mobility" of an automobile creates a risk that the evidence or contraband will be permanently lost while a warrant is obtained. In addition, **a car passenger**— unlike the unwitting tavern patron in *Ybarra*—**will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing.** A criminal might be able to hide contraband in a passenger's belongings as readily as in other containers in the car—perhaps even surreptitiously, without the passenger's knowledge or permission.

*Id.* (emphasis added) (citations omitted).

### (4) Analysis

### (a) Whether or Not the Evidence Was Fruit of Appellant's Arrest

In this case, we agree with the State that there is no connection between appellant's arrest and the counterfeited

credit cards that he moved to suppress.[13] Appellant's arrest is a non-issue with regard to the suppression of the counterfeited credit cards from the wallet of which Mashea claimed ownership. Officer Sheehan asked Mashea for, and received, consent to search the jacket for weapons. After Officer Sheehan discovered a wallet in the jacket, he asked Mashea for, and received, consent to search the wallet for identification. Officer Sheehan then discovered the counterfeited credit cards. Appellant was not arrested until after these events. Thus, Officer Sheehan's discovery of the contraband—the counterfeited credit cards that resulted in the instant conviction—was not a product of the arrest.[14] The Fourth Amendment's exclusionary rule applies to the "fruit of the poisonous tree"— that is, evidence that results from law enforcement officers' unconstitutional actions. *See Cox v. State*, 421 Md. 630, 651, 28 A.3d 687 (2011) ("[T]he fruit of the poisonous tree doctrine excludes direct and indirect evidence that is a product of police conduct in violation of the Fourth Amendment." (Cita-

---

**13.** The issue of whether law enforcement officers had probable cause to arrest appellant is preserved for appellate review because it was raised in the circuit court. Ironically, it was the prosecutor who raised the issue in the circuit court by arguing: "[A]t that point, just as if drugs had been discovered, they've got probable cause to arrest everybody." Afterward, the circuit court, ruling from the bench, endorsed the State's position by stating: "[O]nce the police discover contraband, they're not going to ignore that." That appellant did not mention probable cause while arguing before the circuit court is not relevant. Pursuant to Maryland Rule 8–131(a), to be preserved for appellate review, an issue simply needs to be "raised in or decided by the trial court," regardless of which party raises the issue. *See Webb v. State*, 185 Md.App. 580, 595, 589, 971 A.2d 949 (2009) (This Court considered an issue to be preserved, even though the State, not the defendant, raised the issue in the trial court.).

**14.** At trial, the State conceded that, because Sergeant White cited Norris rather than arresting him, law enforcement officers could not have legally searched the Expedition as a search incident to arrest. *See Knowles v. Iowa*, 525 U.S. 113, 114, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) (The Supreme Court held that a law enforcement officer violated the Fourth Amendment during a traffic stop by searching the defendant's vehicle after issuing a citation rather making an arrest.). We do not reach the issue of whether law enforcement officers could have legally searched the Expedition before discovering the counterfeited credit cards.

tions and internal quotation marks omitted)). Because Officer Sheehan's discovery of the counterfeited credit cards did not result from appellant's arrest, the issue of whether law enforcement officers had probable cause to arrest appellant is a question that we need not address with respect to the counterfeited credit cards.[15]

## (b) Probable Cause to Arrest Appellant

■ To the extent that appellant challenges his arrest as a basis for suppression of the Nordstrom shopping bags and his statement claiming ownership of them, upon *de novo* review, we are satisfied that law enforcement officers had probable cause for the arrest.[16] *See Pringle,* 540 U.S. at 373, 124 S.Ct. 795 ("[A] car passenger ... will often be engaged in a common enterprise with" his or her fellow passengers. (Citation and

---

15. It is undisputed that the counterfeited credit cards were discovered **before** appellant's arrest. At oral argument, as to the counterfeited credit cards, appellant contended that, pursuant to *Di Re,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210, a trial court may suppress contraband that was discovered **before** a defendant's arrest if there is a lack of probable cause for the arrest. We disagree. In *Di Re, id.* at 592, 68 S.Ct. 222 the Supreme Court held that the defendant was illegally arrested with a lack of probable cause. The Court concluded that law enforcement officers did not have probable cause to arrest the defendant merely because he was sitting in the same vehicle as a person who, according to an informant's tip, was selling contraband. *Id.* at 592, 583, 68 S.Ct. 222. **After** the defendant was arrested, he complied with law enforcement officers' request to empty his pockets, which contained contraband. *Id.* at 583, 68 S.Ct. 222. Thus, *Di Re* is inapposite here, where contraband—namely, counterfeited credit cards—were discovered **before** appellant's arrest.

16. At oral argument, appellant contended that his arrest preceded the discovery of the Nordstrom shopping bags and his statement claiming ownership of the Nordstrom merchandise. Although there was no testimony about the Nordstrom shopping bags, the record suggests that law enforcement officers did not discover the Nordstrom shopping bags—and appellant did not make the statements about the Nordstrom shopping bags—until after Officer Sheehan discovered the counterfeited credit cards. The record leaves unclear whether law enforcement officers' discovery of the Nordstrom shopping bags—as well as appellant's statements about the Nordstrom shopping bags—occurred before or after appellant's arrest.

internal quotation marks omitted)).[17] According to Officer Sheehan, after every question that he asked, the passengers would **"all look at each other and then one of them would respond with an answer."** (Emphasis added). Because of the passengers' suspicious behavior, Officer Sheehan asked the passengers to exit the Expedition.[18]

■ Officer Sheehan could reasonably have attributed the contraband—a stack of counterfeited credit cards—to appellant because the contraband was accessible to all of the passengers. The counterfeited credit cards were in a wallet that was in a jacket that nobody was wearing. Rather, **the jacket was sitting on the backseat floor, where the passengers—including appellant—could have accessed it.** Indeed, it would have been easier for appellant, who was sitting in the backseat, to access the jacket than for Mashea, who was sitting in the front seat. Where contraband is in a location that is "accessible to all" of a vehicle's passengers, law enforcement officers may reasonably believe that the passengers have "knowledge of, and exercise[ ] dominion and control over," the contraband. *Pringle*, 540 U.S. at 372, 124 S.Ct. 795 (The Supreme Court held that a law enforcement officer had probable cause to arrest a vehicle's passenger where cocaine was stored in the backseat's armrest). Based on the reasonable belief that appellant actually or constructively possessed the counterfeited credit cards, Officer Sheehan had probable cause for the arrest.

That Mashea claimed ownership of the jacket and the wallet is not dispositive because it does not change the circumstance that the counterfeited credit cards were accessible to appellant. *See Stone v. State*, 178 Md.App. 428, 440, 941 A.2d 1238 (2008) ("[P]ossession may be joint." (Citation and internal

---

17. Although, in *Pringle*, 540 U.S. at 373, 124 S.Ct. 795, the Supreme Court used the term "driver," we see no reason not to apply the Court's holding to passengers as well.

18. "[A] police officer may as a matter of course order the [passengers] of a lawfully stopped car to exit [the] vehicle[.]" *Maryland v. Wilson*, 519 U.S. 408, 410, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997).

quotation marks omitted)). Ownership of contraband's container—here, a wallet within a jacket—is merely one of multiple factors to consider when determining possession. *See Belote v. State*, 199 Md.App. 46, 55, 20 A.3d 143 (2011) (This Court noted that "ownership or some possessory right in the premises or the automobile in which the contraband is found" is one of four non-exclusive factors to consider in determining possession. (Citation omitted)). We decline to read *Pringle* as extinguishing probable cause to arrest any other passenger as soon as one passenger claims ownership of contraband. To hold otherwise would allow perpetrators to "throw themselves on the grenade" by claiming ownership in contraband, thus exculpating others.

Appellant's attempt to distinguish *Pringle* and rely on *Di Re* fails.[19] In the instant case, in addition to the counterfeited credit cards being accessible to appellant, further evidence of appellant's knowledge of and control over the counterfeited credit cards existed, as appellant and his two fellow passengers, after every question that Officer Sheehan asked, would **"all look at each other and then one of them would respond with an answer."** (Emphasis added). This suspicious behavior strongly suggested a common enterprise among **all** of the Expedition's passengers, including appellant.

Contrary to appellant's assertion that credit card counterfeiting, unlike using or dealing controlled dangerous substances, "is not so open a crime that passengers in the same vehicle would necessarily be engaged in a joint criminal enterprise[,]" there is no reason to treat possession of counterfeited credit cards any differently from possession of controlled dangerous substances. Criminal statutes govern the possession of both counterfeited credit cards and controlled dangerous substances. *See* C.L. § 8–205(b)(3)(i) ("A person may not, with the intent to defraud another[,] **possess** . . . a falsely

---

**19.** In *Pringle*, 540 U.S. at 373–74, 124 S.Ct. 795 the Supreme Court distinguished *Di Re*, 332 U.S. at 592–94, 68 S.Ct. 222 because the informant in *Di Re* singled out the defendant's fellow passenger as the perpetrator.

made instrument or device that purports to be a credit card, with knowledge that the instrument or device was falsely made[.]") (emphasis added); C.L. § 5–601(a)(1) ("[A] person may not [ ]**possess** . . . a controlled dangerous substance[.]") (emphasis added). Appellant points us to no statute or case—and we find none—pursuant to which counterfeited credit cards belong to a unique class of contraband whose possession cannot be attributed to more than one person. For all the reasons discussed above, we conclude that law enforcement officers had probable cause to arrest appellant.

## II.

### Waiver of the Right to a Jury Trial

#### (1) Contentions

Appellant contends that the circuit court erred in determining that appellant knowingly waived the right to a jury trial. Appellant argues that the circuit court "had no basis on which to infer that [appellant]'s decision to waive his right to a jury trial was made knowingly." Appellant asserts that he "was not adequately informed about the nature of a jury trial[.]" Although appellant concedes that he replied affirmatively when the circuit court asked him whether he had gone over the rights that he would give up by not demanding a jury trial, appellant maintains that "the record does not disclose the contents of the discussion between [appellant] and his attorney, and in particular whether his attorney ever advised him about the presumption of innocence."

Alternatively, appellant contends that the circuit court erred in failing to announce its determination of knowledge on the record, as required by Maryland Rule 4–246(b). Appellant argues that "[a]t no time did the [circuit] court state that the waiver was knowing and intelligent. Nor can the [circuit] court's language be construed as encompassing a [determination] that the waiver was knowing."

The State responds that "[t]he record sufficiently establishe[s] that [appellant] was aware [of] the nature of his right

to [a] jury trial when he elected to waive that right." The State contends that "[t]hese circumstances, in their totality, are sufficient to show a knowing waiver." The State argues that "[t]he advice of right[s] form filled out and signed by [appellant] shows that he was aware of his right to a jury trial, and was sufficiently informed of the nature of that right." The State asserts that appellant "confirmed for the [circuit] court, on the record, that he had reviewed and discussed those rights with his attorney, that he understood them, and that he signed the form." The State contends that the purported lack of an on-the-record determination of knowledge "does not render [appellant]'s waiver deficient."

The State argues that the purpose of Maryland Rule 4–246(b)'s requirement of an on-the-record announcement "is not to safeguard [a] defendant's right to a jury trial per se, but [rather] to facilitate a reviewing court's inquiry into whether [or not] that right was safeguarded."

Alternatively, the State asserts that the purported lack of an on-the-record announcement was "a 'technical rule violation' subject to [forfeiture[20]] and harmless error analysis." The State maintains that appellant engaged in "gamesmanship" by failing to object below, as he "had no reason to do so because his jury trial waiver was the product of a plea agreement intended to facilitate" the instant appeal. The State contends that any error was harmless because the purported lack of an on-the-record announcement "was a technical oversight that did not affect the constitutional validity of [appellant]'s waiver or the outcome of the proceeding."

---

**20.** We substitute "forfeiture" for "waiver" in the State's brief because "waiver"—although it has often been used synonymously with "a procedural forfeiture of the right to appellate review of trial error by failure to lodge a contemporaneous objection," *i.e.* lack of preservation—is actually a term of art that refers specifically to "the intentional relinquishment or abandonment of a known right[,]" *e.g.* the right to a jury trial. *Savoy v. State,* 420 Md. 232, 240, 22 A.3d 845 (2011) (citation and internal quotation marks omitted). The distinction between "forfeiture" and "waiver" is especially important in a case like the instant one, which involves both concepts.

In a reply brief, appellant contends that his waiver of the right to a jury trial was not knowing because the two documents to which the State points—the advice of rights form and the other document with appellant's signature—did not inform him that "he would be presumed to be innocent or that a jury would consist of twelve persons." Appellant asserts that the State's reliance on *Boulden, infra,* is misplaced because that case "concerned the timing of compliance with Maryland Rule 4–246[ (b) ], not, as in [his] case, with the failure to comply with the rule at all." (Emphasis omitted).

### (2) Law

### (a) Whether or Not a Waiver of the Right to a Jury Trial Is Knowing

In *Aguilera v. State,* 193 Md.App. 426, 431, 436, 997 A.2d 888 (2010), this Court explained that the right to a jury trial can be waived. This Court stated:

> The Sixth Amendment to the United States Constitution provides that, [i]n all criminal prosecutions, the [defendant] shall enjoy the right to a jury trial. The Sixth Amendment right to a jury trial is applicable to the States through the Fourteenth Amendment.
>
> A defendant may waive his or her right to a trial by jury and elect instead to be tried by the court. In order for there to be a valid waiver of the right to a jury trial, however, the trial [court] must be satisfied that there has been an intentional relinquishment or abandonment of a known right or privilege.

*Id.* at 431, 997 A.2d 888 (citations and internal quotation marks omitted).

A defendant's waiver of the right to a jury trial must be "made knowingly[.]" Md. R. 4–246(b).[21] In *Boulden v. State,* 414 Md. 284, 295 n. 5, 995 A.2d 268 (2010), the Court of

---

**21.** Although Maryland Rule 4–246(b) also requires that a defendant's waiver of the right to a jury trial be made "voluntarily[,]" appellant does not raise the issue of voluntariness on appeal.

Appeals listed examples of what a defendant should know about a jury trial before waiving the right to a jury trial. The Court stated:

Although the law does not require the [trial] court to use a specific form of inquiry in determining whether a defendant's waiver of a jury trial is knowing and voluntary, the record must demonstrate an intentional relinquishment of a known right. What questions must be asked will depend upon the facts and circumstances of the particular case.

In determining whether a waiver is knowing, the [trial] court should seek to ensure that the defendant understands that: (1) the defendant has the right to a trial by jury; (2) unless the defendant waives a trial by jury, the case will be tried by a jury; (3) a jury consists of 12 individuals who reside in the county where the court is sitting, selected at random from a list that includes registered voters, licensed drivers, and holders of identification cards issued by the Motor Vehicle Administration, seated as jurors at the conclusion of a selection process in which the defendant, the defendant's attorney, and the State participate; (4) all 12 jurors must agree on whether the defendant is guilty or not guilty and may only convict upon proof beyond a reasonable doubt; (5) if the jury is unable to reach a unanimous decision, a mistrial will be declared and the State will then have the option of retrying the defendant; and (6) if the defendant waives a jury trial, the court will not permit the defendant to change the election unless the [trial] court finds good cause to permit the change.

*Id.* (quoting Maryland Rule 4–246(b)'s committee note) (emphasis omitted).

In *Walker v. State,* 406 Md. 369, 383, 376, 958 A.2d 915 (2008), the Court of Appeals held that the defendant knowingly waived the right to a jury trial where the defendant replied "Yeah" to the trial court's question "[Y]ou fully understand about jury trials and . . . all that." The Court stated:

[T]he [trial] court is ultimately responsible for determining that the defendant had some knowledge of the jury trial

right before being allowed to waive it. To waive the constitutionally protected right to a trial by jury the trial [court] must be satisfied that there has been an intentional relinquishment or abandonment of a known right or privilege. Because only the defendant can validly waive his or her right to trial by jury, the defendant must directly respond to the waiver inquiry. Moreover, in determining whether the defendant made the waiver knowingly, we will look to the totality of the circumstances. . . .

In the case at bar, the record shows that [the defendant] obviously had "some knowledge" of his right to a jury trial, because he (1) made a considered decision to pray a jury trial rather than stand trial in the District Court, (2) had been a criminal defendant in at least one jury trial presided over by the very same [trial] court judge who presided over the case at bar, (3) was represented by counsel, who reached an agreement with the State, pursuant to which the State would drop all but one of several charges then pending against the defendant in the [trial] court, (4) elected to proceed on a "not guilty agreed statement of facts" in order to preserve for appellate review some issue that was thereafter abandoned, and (5) advised the [trial] court that he understood that he was "waiving any right to have a jury trial of this matter, as well as a [bench] trial[.]" Under these circumstances, the [trial] court had an adequate basis to determine that [the defendant]'s waiver was knowing. . . .

While it is true that the "some knowledge" requirement includes an on-the-record showing that the defendant knows that (1) a criminal defendant is presumed to be innocent and cannot be convicted unless the trier of fact is persuaded beyond a reasonable doubt of the defendant's guilt, and (2) if the defendant did not waive a jury trial, his or her case would be tried by a jury of twelve persons, it is clear that the requirement was satisfied in the case at bar because it is unreasonable to hypothesize that [the defendant]—having elected a jury trial when facing criminal charges on at last one prior occasion—does not know either the prosecution's

burden of persuasion or the number of persons who would be on the jury.

*Id.* at 378, 382–83, 385, 958 A.2d 915 (citations, footnotes, and some internal quotation marks omitted) (one alteration in original).

### (b) Procedure for Waiver of the Right to a Jury Trial

Maryland Rule 4–246(b) provides:

A defendant may waive the right to a trial by jury at any time before the commencement of trial. **The court may not accept the waiver until,** after an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, **the court determines and announces on the record that the waiver is made knowingly** and voluntarily.

(Emphasis added). In 2007, Maryland Rule 4–246(b) was amended "in response to *Powell v. State,* 394 Md. 632, 907 A.2d 242 (2006), *cert. denied,* 549 U.S. 1222, 127 S.Ct. 1283, 167 L.Ed.2d 103 (2007), in which [the] Court [of Appeals] upheld [the defendant]'s jury waiver although the trial [court] neglected to state on the record that [it] found the jury trial waiver to be knowing[.]" *Walker,* 406 Md. at 377 n. 1, 958 A.2d 915. In *Aguilera,* 193 Md.App. at 439, 997 A.2d 888, this Court explained that the 2007 amendment to Maryland Rule 4–246(b) does not require a trial court to "engage in any fixed litany." This Court stated:

In interpreting [Maryland] Rule 4–246(b), as with any rule of procedure, we apply [t]he same fundamental principles of statutory construction. The cardinal rule of statutory construction is to ascertain and effectuate legislative intent.

As this Court has explained, to ascertain the meaning of a rule:

First, we must examine the words of the rule, giving them ordinary and natural meaning. Where the language of the rule is clear and unambiguous, our analysis ends. However, the goal of such analysis is always to discern

the legislative purpose. . . . To that end we must consider the context in which . . . the rule appears, including related statutes or rules and relevant legislative history.

We attempt to give [Maryland] Rule [4–246(b) ] an interpretation that is reasonable, not one that is illogical or incompatible with common sense, or that will lead to absurd consequences. . . .

Prior to the amendment of [Maryland] Rule 4–246(b), this Court and the Court of Appeals made clear that, when determining whether a defendant is knowingly and voluntarily waiving his or her right to a jury trial, the trial court is not required to engage in any fixed litany. . . . Whether the waiver is valid depends upon the facts and totality of the circumstances of each case.

. . .

**Nothing in the plain language of [Maryland] Rule 4–246(b), as amended, changes that analysis.** [Maryland] Rule 4–246(b) was not amended to require any particular form of inquiry, either about knowledge or voluntariness.

*Id.* at 433, 439–40, 997 A.2d 888 (emphasis and some omissions added) (one alteration in original) (citations and internal quotation marks omitted).

In *Aguilera,* 193 Md.App. at 437, 434, 438, 997 A.2d 888, this Court held that the trial court complied with Maryland Rule 4–246(b) by stating: "I am satisfied that the defendant understands what he is doing in his election for a bench trial in this case, so a jury trial has been effectively waived"—or, alternatively, this Court held that any error was harmless. As to compliance with Maryland Rule 4–246(b), this Court stated:

The [trial] court's statement that "the defendant *understands* what he is doing in his *election* for a bench trial," along with its statement that the right to "a jury trial has been effectively waived," reflected the [trial] court's conclusion that appellant knew what he was doing in choosing a bench trial, and, with that understanding, he intentionally chose to waive his right to a jury trial. We hold that, although the [trial] court did not use the specific words

" 'knowingly' and 'voluntarily,' " the [trial court] satisfied [Maryland] Rule 4–246(b). The [trial] court's finding here was sufficient to remove all reasonable doubt that the [trial] court considered the issue and found an effective waiver.

We caution that it is the better practice for a trial court to use the words set forth in [Maryland Rule 4–246(b) ], stating specifically its finding that the "waiver is made knowingly and voluntarily." This will avoid claims on appeal, such as that made here, that the waiver of the right to a jury trial was defective. In this case, however, the trial court's finding satisfied the requirements of [Maryland Rule 4–246(b) ].

*Id.* at 437, 997 A.2d 888 (emphasis in original) (citation and some internal quotation marks omitted). As to harmless error, this Court stated:

[Alternatively], any error by the trial court in failing to follow the dictates of [Maryland] Rule 4–246(b) was harmless. As indicated, although the court did not use the words "knowingly" and "voluntarily" in finding that [the defendant]'s right to a jury trial had been "effectively made," the on-the-record finding that the circuit court did make was clearly to that effect.

*Id.* at 438, 997 A.2d 888.

In *Boulden,* 414 Md. at 304–05, 308, 995 A.2d 268, the Court of Appeals held that, by failing to timely object, the defendant forfeited the right to appellate review of the trial court's failure to announce her waiver of the right to a jury trial on the record until after the State rested—or, alternatively, the Court held that any error was harmless. As to forfeiture, the Court stated:

[The defendant forfeited] her right to complain about the tardy jury trial waiver colloquy. At the beginning of the trial, [the defendant] did not object when asked by the trial [court] "are we going forward with a [bench] trial?" Instead, defense counsel answered affirmatively. Moreover, defense counsel could have objected to the failure to place on the record [the defendant]'s waiver of her right to trial

by jury when the State brought the error to everyone's attention at the close of the State's case-in-chief and before the defense was to put on its case. The defense could have moved for a mis-trial.... [A]pproximately two months passed after the conclusion of [the defendant]'s trial until the hearing on her motion for new trial and sentencing. She filed a motion for a new trial and an amendment to that motion one month after trial ended, in neither of which was the timing of the jury trial waiver raised. [The defendant], who was represented by counsel throughout the trial and post-verdict proceedings, had ample opportunity to object to the tardy jury trial waiver.

*Id.* at 304–05, 995 A.2d 268. As to harmless error, the Court stated:

We also conclude that, under the facts and circumstances of this case, the violation of [Maryland] Rule 4–246 constituted harmless error. An error is harmless and does not entitle a defendant to a new trial if the reviewing court is able to determine beyond a reasonable doubt that the error in no way influenced the verdict. Although the rules of procedure are precise rubrics to be strictly followed ...[,] [i]t does not follow, however, that the harmless error doctrine has no application to the Maryland Rules and that a violation of a procedural rule can never be harmless. There is no basis in authority or logic for such a holding. The violations of certain rules, however, because of the nature and purpose of these particular rules, can rarely be deemed harmless error. The right to jury trial and the right to counsel are among such rules.

The actual denial of the unwaived right to trial by jury is ordinarily a structural error and is not subject to harmless error review. A structural error is one that amounted to structural defects in the trial itself. Clearly, the violation here of [Maryland] Rule 4–246 was error, though not structural. Thus, we must determine whether [the defendant] was prejudiced by the tardy waiver. If not, then the error was harmless and she is not entitled to a new trial.... [B]ecause [the defendant] waived voluntarily and knowingly

her right to trial by jury on the record, albeit mid-trial, we similarly do not see how the late waiver, when it was otherwise voluntary and knowing, was prejudicial to [the defendant]. If anything, she received the benefit of hearing the State's case-in-chief before deciding whether to waive a jury trial and putting on her defense to the court alone. Thus, we conclude that the late waiver was harmless error.

*Id.* at 307–08, 995 A.2d 268 (citations and internal quotation marks omitted) (some alterations and omissions in original).

### (3) Analysis

### (a) Preservation of Any Issue as to the Circuit Court's Acceptance of the Not Guilty Agreed Statement of Facts or Compliance with Maryland Rule 4–246(b)

 Returning to the instant case, we begin by determining that any issue as to the circuit court's acceptance of the not guilty agreed statement of facts or compliance with Maryland Rule 4–246(b) is not preserved for appellate review. Appellant did not object in the circuit court with regard to any issue as to the waiver of the right to a jury trial. Appellant could have objected to the circuit court's alleged errors prior to the State's reading of the not guilty agreed statement of facts or the circuit court's finding of guilt. Appellant moved for a judgment of acquittal, but made no argument whatsoever. A defendant forfeits the right to appellate review of any issue as to the waiver of the right to a jury trial where the first complaint arises on appeal. *See Boulden,* 414 Md. at 293, 296, 289, 995 A.2d 268 (The Court of Appeals held that, by complaining for the first time on appeal, the defendant forfeited the right to appellate review of the trial court's failure to announce the waiver of the right to a jury trial on the record until after the State rested.). By failing to object to the circuit court's alleged errors, appellant forfeited the right to appellate review of any issue as to the circuit court's acceptance of the not guilty agreed statement of facts or compliance with Maryland Rule 4–246(b).

Appellant does not ask this Court to review for plain error, and we decline to do so. *See Garner v. State,* 183 Md.App. 122, 151–52, 960 A.2d 649 (2008), aff'd, 414 Md. 372, 995 A.2d 694 (2010) ("In that the [defendant], strangely, does not even ask us to overlook non-preservation, this contention may qualify as an instance of non-preservation squared."). Both alleged errors, if existent, were readily correctable in the circuit court. *See Morris v. State,* 153 Md.App. 480, 510, 837 A.2d 248 (2003), *cert. denied,* 380 Md. 618, 846 A.2d 402 (2004) ("[W]e [sh]ould not exercise our right to take cognizance of and correct any plain error material to the rights of the [defendant], of our own motion, if the alleged error was one that might have been readily corrected if it had been called to the trial [court]'s attention." (Citation and internal quotation marks omitted)).

### (b)(i) Merits as to the Circuit Court's Acceptance of the Not Guilty Agreed Statement of Facts

Having determined that appellant has forfeited the right to appellate review of the issue, we nonetheless conclude that the circuit court did not err in accepting the not guilty agreed statement of facts. At the not guilty agreed statement of facts proceeding, the advice of rights form—containing appellant's name, address, and date of birth—was entered into evidence as an attachment to the not guilty agreed statement of facts. Appellant's signature and the date, as well as appellant's counsel's signature and the date, appear at the bottom of the document. There are checkmarks in ink next to each item on the form. After appellant's counsel identified the advice of rights form, the following exchange occurred:

> THE COURT: All right, sir, [appellant], **you've gone over the rights that you give up when you enter a plea of guilty** [22] **in a criminal case with your lawyer, correct, sir?**
>
> [APPELLANT]: **Yes,** sir.

---

22. *See supra* footnote 7.

THE COURT: **And you've discussed them with him, you understand what they are, and you have signed this advice of rights form, correct, sir?**

[APPELLANT]: **Yes, sir.**

THE COURT: All right. **Mr. State, are you satisfied that this matter is being, this plea is being entered voluntarily with full awareness of potential consequences?**

[PROSECUTOR]: **Yes,** Your Honor.

(Emphasis added). The circuit court then asked the State to read aloud the not guilty agreed statement of facts.

A separate document bearing appellant's signature was entered into evidence as an attachment to the not guilty agreed statement of facts. The untitled document reads:

I have read each page of the agreed statement of facts and have discussed it with my attorney, [appellant's counsel]. **I fully understand these facts and agree that, if the facts were believed by a jury, the facts are sufficient [to] support a finding of guilt.** I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this document fully.

(Emphasis added).

The record amply demonstrates that appellant knew that: (1) he was entitled to a jury trial; (2) a jury would consist of twelve persons who would be picked at random from the community; (3) a jury would have to find him guilty beyond a reasonable doubt before he could be convicted; (4) a jury verdict would have to be unanimous; (5) if he waived a jury trial in favor of a bench trial, the circuit court would try him; (6) the circuit court, just like a jury, would have to find him guilty beyond a reasonable doubt before he could be convicted; and (7) if a jury believed the facts that were set forth in his not guilty agreed statement of facts, the facts would suffice to support a finding of guilt. Appellant told the circuit court that: (1) he had gone over, with his attorney, the rights that he would give up by not going to trial, and (2) he understood those rights.

██ A defendant's waiver of the right to a jury trial is knowing where the record shows that the defendant, who is represented by counsel, has "some knowledge" of what a jury trial entails. *See Walker,* 406 Md. at 382–83, 958 A.2d 915 (The Court of Appeals held that the defendant knowingly waived the right to a jury trial where the defendant "was represented by counsel, who reached an agreement with the State, pursuant to which the State would drop all but one of several charges then pending against the defendant in the [trial] court, . . . elected to proceed on a 'not guilty agreed statement of facts' . . . and . . . advised the [trial] court that he understood that he was 'waiving any right to have a jury trial of this matter, as well as a [bench] trial[.]' " (One alteration in original) (footnote omitted)); *see also Boulden,* 414 Md. at 295 n. 5, 995 A.2d 268 (The Court of Appeals listed elements of a jury trial—including that "the defendant has the right to a trial by jury[,]" that "a jury consists of [twelve] individuals who reside in the county where the court is sitting, selected at random[,]" and that "all [twelve] jurors must agree on whether the defendant is guilty or not guilty and may only convict upon proof beyond a reasonable doubt"—that a trial court should explain to defendant before allowing a waiver of the right to a jury trial.).

██ Appellant's argument that he was not informed that a jury is comprised of twelve persons, or that he would be presumed innocent at a jury trial, fails because appellant was informed of both matters via the advice of rights form, on which appellant placed checkmarks next to the items that stated that "the jury would consist of twelve persons unless you agree to a lesser number," and that neither a jury nor the circuit court could convict him unless it found him guilty beyond a reasonable doubt.[23] Under the standard of "some knowledge," the defendant's knowledge "need not be 'complete' or 'entire.' " *Walker,* 406 Md. at 379, 958 A.2d 915

---

**23.** A trial court may either inform the defendant that he or she is "presumed innocent," or inform the defendant that he or she would not

(citation omitted). Thus, the record need not show that the defendant had full knowledge of a jury trial. *See Walker, id.* at 379–81, 958 A.2d 915 (The Court of Appeals discussed cases in which the Court held that the defendants knowingly waived the right to a jury trial, even though some elements of a jury trial—*e.g.* the requirement of unanimity and the jury selection process—were not explained to the defendants.). For all the reasons discussed above, we conclude that the circuit court did not err in accepting the not guilty agreed statement of facts.

### (b)(ii) Merits as to the Circuit Court's Compliance with Maryland Rule 4–246(b)

Having determined that appellant has forfeited the right to appellate review of the issue, we nonetheless are equally satisfied that the circuit court complied with Maryland Rule 4–246(b), pursuant to which a trial court may not accept a waiver of the right to a jury trial until the trial court "determines and announces on the record that the waiver is made knowingly[.]" We note initially that, "[a]lthough [Maryland] Rule 4–246 provides the **procedures** for waiver of the right to trial by jury, **the ultimate inquiry regarding the validity of a waiver is whether there has been an intentional relinquishment or abandonment of a known right[.]**" *Boulden,* 414 Md. at 295, 995 A.2d 268 (emphasis added) (citation and internal quotation marks omitted). As discussed above, appellant knowingly waived his right to a jury trial. The issue of whether the circuit court followed procedure is secondary.

Upon review of all of the circumstances here, we conclude that the circuit court complied with Maryland Rule 4–246(b)'s requirement that its determination of knowledge be announced on the record. The circuit court announced its determination in the form of a leading question that was

---

be convicted until proven guilty "beyond a reasonable doubt." *See Boulden,* 414 Md. at 313, 291, 995 A.2d 268 (The Court of Appeals held that "it [was] clear that [the defendant]'s waiver was ... knowing" where the trial court, without using the terms "presumed innocent," informed the defendant: "In a jury trial the State has the burden of proving its case beyond a reasonable doubt, just as in a [bench] trial.")

addressed to the prosecutor: "Mr. State, are you satisfied that this matter is being, this plea is being entered voluntarily with full awareness of potential consequences?" The prosecutor responded in the affirmative. The circuit court was under no obligation to obtain the State's approval before accepting the not guilty agreed statement of facts. By asking the question, the circuit court demonstrated its awareness that a waiver of the right to a jury trial must be made knowingly. Implicit in the circuit court's question was its understanding and determination that the waiver of the right to a jury trial had been entered knowingly. The circuit court effectively determined on-the-record that the waiver of the right to a jury trial was knowingly made.

We decline to hold that the circuit court erred simply by announcing its determination with respect to the not guilty agreed statement of facts in the form of a leading question rather than a declarative sentence, *e.g.* "I find that his plea is being entered voluntarily with full awareness of its potential consequences." [24] A trial court complies with Maryland Rule 4–246(b) by stating its determination on the record in an intelligible form. *See Aguilera,* 193 Md.App. at 439, 997 A.2d 888 (Maryland Rule 4–246(b) does not require a trial court to "engage in any fixed litany." (Citations omitted)). For all the reasons discussed above, we conclude that the circuit court did not err in accepting appellant's waiver of the right to a jury trial under Maryland Rule 4–246(b).[25]

---

**24.** We also decline to hold that the circuit court erred by substituting "full awareness of potential consequences" for "knowledge." *See* Black's Law Dictionary 888 (8th ed. 2004) ("[K]nowledge" is defined as "An **awareness or understanding** of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact." (Emphasis added).); *see also Aguilera,* 193 Md.App. at 437, 431, 997 A.2d 888 (This Court held that the trial court complied with Maryland Rule 4–246(b), despite not referring to "knowledge," by stating: "I am satisfied that the defendant **understands** what he is doing in his election for a bench trial in this case[.]" (Emphasis added)).

**25.** Although we conclude that the circuit court complied with Maryland Rule 4–246(b), as in *Aguilera,* 193 Md.App. at 437, 997 A.2d 888, "[w]c

356

■ Alternatively, we conclude that any error in complying with Maryland Rule 4–246(b) was harmless beyond a reasonable doubt. As discussed above, appellant knowingly waived the right to a jury trial. Announcing the determination that appellant knowingly waived the right to a jury trial would not have changed the case's outcome or affected the content of the not guilty agreed statement of facts that led to the convictions. Thus, any technical rule violation by the circuit court did not prejudice appellant. A trial court's error in following Maryland Rule 4–246(b)'s procedural requirements is harmless beyond a reasonable doubt where the error does not prejudice the defendant. *See Boulden,* 414 Md. at 305, 308, 995 A.2d 268 (The trial court's failure to announce the defendant's waiver of the right to a jury trial on the record until after the State rested was "a technical rule violation" that constituted harmless error because the defendant "waived voluntarily and knowingly her right to trial by jury on the record[.]"). In this case, any failure by the circuit court to follow Maryland Rule 4–246(b)'s procedural requirements was harmless beyond a reasonable doubt.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

caution that it is the better practice for a trial court to use the words set forth in [Maryland Rule 4–246(b) ], stating specifically its finding that the 'waiver is made knowingly and voluntarily.' This will avoid claims on appeal, such as that made here, that the waiver of the right to a jury trial was defective."