*Robert Eugene Hammond v. State of Maryland*, No. 44, September Term, 2022.  Opinion by Graeff, J.

**CRIMINAL LAW – PRESERVATION REQUIREMENT REGARDING WAIVER OF JURY TRIAL**

Maryland Rule 4-246(b) provides that a court may not accept a jury trial waiver until it "determines and announces on the record that the waiver is made knowingly and voluntarily."  To challenge a failure to comply with Rule 4-246(b) on appeal, however, there must be an objection raised in the trial court.

Unlike a claim that the procedure in Rule 4-246(b) was not followed, a claim of a constitutional violation of the right to a jury trial does not require an objection to preserve the claim.

Prior involvement in drug-related offenses does not, by itself, constitute a factual trigger requiring a specific inquiry into the voluntariness of the defendant's waiver of the right to a jury trial.  The totality of the circumstances, including the defendant's demeanor, should be evaluated to determine whether the jury trial waiver is knowing and voluntary.

Evidence that the defendant fired gunshots at a residence was sufficient to convict him for second-degree assault of the "intent to frighten" modality because the defendant created a zone of danger to all the residents in the home, and he intended to place everyone in the home in fear of imminent physical harm.

Circuit Court for Cecil County
Case No. C-07-CR-20-000442

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 44

September Term, 2022

_____

ROBERT EUGENE HAMMOND, IV

v.

STATE OF MARYLAND

_____

Wells, C.J.,
Graeff,
Nazarian,

                    JJ.

_____

Opinion by Graeff, J.

_____

Filed: February 2, 2023

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

After a three-day bench trial, the Circuit Court for Cecil County convicted appellant, Robert Eugene Hammond, of first-degree assault, use of a firearm in the commission of a crime of violence, possession of a firearm with a felony conviction, illegal possession of ammunition, and possession of a controlled dangerous substance. The court imposed an aggregate sentence of 30 years.[1]

On appeal, appellant presents the following questions for this Court's review, which we have reordered and rephrased slightly, as follows:

1.      Did the circuit court violate appellant's constitutional rights by failing to ensure that he knowingly and voluntarily waived his right to a jury trial?

2.      Was the evidence legally sufficient to support appellant's assault convictions?

For the reasons set forth below, we shall affirm the judgments of the circuit court.

**FACTUAL AND PROCEDURAL BACKGROUND**

On May 11, 2020, Elkton police responded to reports of a shooting at a residence on Huntsman Drive. At the time of the shooting, there were multiple people inside the house, including Brittany Dill, five of her children, her boyfriend, Terrance "HB" Lee, and another man, Michael Duff. When the police arrived, they found Mr. Duff, who was shot in his back. Ms. Dill's six-year-old son, A.M., was bleeding from a gunshot wound to his

---

[1] The court sentenced appellant to 25 years, all but ten suspended, for the conviction of first-degree assault; 20 years, all but 10 suspended, consecutive, for the conviction of use of a firearm in the commission of a crime of violence; 15 years, all but 10 suspended, consecutive, for the conviction of possession of a firearm with a felony conviction; one year, all suspended, consecutive, for the conviction of illegal possession of ammunition; and two years, all suspended, consecutive, for the convictions of two counts of possession of a controlled, dangerous substance.

left knee.[2]  He was transported to Nemours A.I. Dupont Hospital for Children in Wilmington, Delaware ("Nemours Hospital"), where he received surgery to close the wound.

Detectives searched the Huntsman Drive residence and seized, among other things, a .22 caliber semi-automatic rifle, six .22 caliber shell casings, and a surveillance system, containing footage from three cameras installed at different locations around the outside of the residence.  The police reviewed the surveillance system footage, which appeared to show appellant run past the Huntsman Drive residence with his two brothers, Jason "Ty" Holland and Cody Hammond, and then showed "puffs of smoke," indicating that gunshots were fired at the house.  Appellant's mother, Crystal Hammond, was visible near the residence as well.  The footage also showed Mr. Lee as he held a rifle through the front door of the house and fired two shots.

Later that evening, detectives obtained a search warrant for appellant's residence on Cow Lane, located "to the left and diagonal to the rear," through the alleyway or "cut," next to the Huntsman Drive residence.  During the search, they recovered multiple types of ammunition, a box for a handgun, and a magazine for a handgun, but they did not recover any firearms.  They also recovered drugs, which were later identified as fentanyl and methamphetamine.

---

[2] We refer to the minor child by his initials, A.M.

At 1:00 a.m. on May 12, 2020, the police detained appellant. He waived his *Miranda* rights and agreed to be interviewed about the shooting.[3] In response to Detective Lindsey Ziegenfuss's questioning, appellant stated that he did not hear gunshots, did not know that Mr. Lee's house had been "shot up," did not have any "beef" with him or any reason to take revenge against him, and did not walk by Mr. Lee's house alone or with his brothers that day. He also denied that he owned or carried a gun, noting that it was illegal for him to do so as a convicted felon.[4] He denied that anyone at his residence owned a gun. He admitted that his brother and Mr. Lee had fought the previous year, but he stated that it had since resolved. Detective Ziegenfuss then asked appellant to identify individuals shown in still images taken from the surveillance footage at the Huntsman Drive residence. When she asked whether the images showed appellant's brother and mother, appellant repeatedly stated that he did not "know who that is." Appellant remained in custody overnight and was released on bail the following morning.

On July 1, 2020, appellant was indicted for multiple crimes against Mr. Duff, Ms. Dill, and A.M. He was charged with three counts of attempted first-degree murder, three counts of attempted second-degree murder, three counts of first-degree assault, three counts of second-degree assault, three counts of reckless endangerment, and multiple counts of conspiracy. Appellant also was indicted for four counts of use of a firearm in the commission of a crime of violence, one count of wearing, carrying, and transporting a

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] Appellant indicated during the interview that he previously had been convicted for the illegal sale of a handgun.

handgun, one count of firearm possession with a felony conviction, one count of illegal possession of a regulated firearm, one count of illegal possession of ammunition, and six counts related to drug charges.[5]

Trial began on September 1, 2021. In its opening statement, the State indicated that the surveillance footage from the camera system at the Huntsman Drive residence showed appellant's brother, Jason Holland, run through the "cut" next to the house and meet with Cody and Crystal Hammond. Appellant then appeared in the video, with a handgun in his hand, moved the "slide on the gun," and proceeded through the "cut" with his two brothers. Appellant and his two brothers approached the back of the property and Mr. Holland fired a shot, prompting Mr. Lee to return fire, and leading to "a hail of gunfire." Thirteen bullets hit the Huntsman Drive residence. "Eight of the rounds that hit the house . . . [were] 7.62 by 39 millimeter casings, which is consistent with either an SKS or an assault rifle." When the police arrived, they found .25 caliber casings and .380 casings, which are for handguns, "consistent with what was shown on the video." Upon searching appellant's residence on Cow Lane, the police found "a box of ammo with .25 caliber . . . . a box of ammo with .380 caliber. . . . some loose 7.62 by 39 millimeter ammunition. . . . a magazine for a gun," and "a box for a gun." The police did not find any guns, however, "because at that point several of the individuals involved had fled the area." The State concluded that "the evidence will show that the defendant willingly participated in this. He was prohibited

---

[5] The State did not oppose, and the court ultimately granted, a motion for judgment of acquittal on all charges that did not relate to A.M., the related gun charges, or the drug charges.

4

from possessing any handguns. That he was involved in the distribution of drugs. And the evidence will show that he is guilty of the charges."

Counsel for appellant provided a brief opening statement that, even if the court "finds that the defendant is guilty of anything, it's not the scenario that was painted by the State." Rather, Mr. Lee was "shooting out of this house minutes before" appellant or his brothers appeared.

Detective Thomas Saulsbury testified that he was on patrol in Hollingsworth Manor at 3:30 p.m. on May 11, 2020, when he heard "a volley of about five to six gunshots." He arrived at Huntsman Drive and saw Nakeere Sayers, whom the detective was familiar with, wearing a backpack and running through the "cut," from the Huntsman Drive residence toward appellant's residence on Cow Lane. He did not pursue Mr. Sayers at that time because Ms. Dill informed him that Mr. Duff had been shot inside the house. As he entered the house, he noticed bullet holes outside. Inside, he noticed an AR-15 lying on a staircase. He also found unused ammunition and spent shell casings in the living room. The room smelled "like gunshot residue."

The State then played video footage captured at the scene by Detective Saulsbury's body worn camera and asked him to identify the individuals shown in and outside of the Huntsman Drive residence. He identified Mr. Duff, who was shot in the back, A.M., who was bleeding from an apparent gunshot wound to his left knee, A.M.'s grandmother, Theresa Dill, and Mr. Lee. The footage showed Detective Saulsbury applying a tourniquet to A.M.'s leg and cutting A.M.'s pants to apply bandages around the wound until EMS workers arrived.

5

After leaving Huntsman Drive, Detective Saulsbury went to several houses in the area. He went to residences in Hollingsworth Manor because he received a report that "the people allegedly involved with this shooting, one or more of them, had stashed a bag" nearby. He searched the shared yard between two residences and recovered a backpack that looked similar to the one that he observed Mr. Sayers wearing earlier. The recovered backpack contained firearms and what appeared to be illegal drugs, including heroin mixed with fentanyl, as well as marijuana. Detective Saulsbury then went to another residence in Hollingsworth Manor because three suspects were allegedly there, including appellant, also known as "Little Blackie," and appellant's two brothers.

Detective Joshua Leffew testified that he was assigned to the Elkton Police Department's Criminal Investigative Division. At approximately 3:30 p.m. on May 11, 2020, he arrived at Huntsman Drive and found a "chaotic" scene of people outside who "appeared to be very scared, very worried." He entered the residence and met with Sergeant Ronald Odom, who directed him to collect digital evidence from the home security system. Detective Leffew located the security system, which was connected to a television in the living room, and he was able to rewind and replay the footage. He then downloaded the footage onto a flash drive and collected the surveillance system equipment. Detective Leffew testified that there was no way to make alterations to the footage; he did not edit it in any way. Detective Leffew then proceeded to "process the scene inside at the residence" by "collecting items of evidentiary value" and tracing the paths from bullet holes left inside the house. He identified more than five holes that came "from the exterior of the residence, specifically to the rear and side of the residence." Another detective,

6

Detective Justin Beamer, collected several .22 caliber cartridges and shell casings at the residence.

Steven Greene, a digital forensic specialist at the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), testified that he assisted the Elkton Police Department with recovering the surveillance system videos at the Huntsman Drive residence. He made a duplicate copy of all the video data that was on the original hard drive, exported the videos onto a flash drive, and edited together the footage captured by each of the three cameras.

Jennifer Cooper, a forensic nurse at Nemours Hospital, testified that her job was to aid "victims of trauma and violence" and "collaborate with law enforcement, the medical team, and social work teams." She photographed a gunshot injury to A.M.'s left knee, which left "large wounds."

Dr. Jeanne M. Franzone, a pediatric orthopedic surgeon at Nemours Hospital, diagnosed A.M. with "a gunshot injury to the left lower extremity." She performed a "fluid challenge" surgical operation, which revealed injuries to muscles in the back of A.M.'s left leg. Dr. Franzone did not recover any bullets or foreign bodies from A.M.'s wound.

Theresa Dill, Ms. Dill's mother[6], testified that she went to the Huntsman Drive residence on May 11, 2020, to help care for five of her grandchildren, including A.M. At approximately 2:45 p.m., Mr. Lee opened the front door of the house, and Theresa observed gunshots being fired from across the street. She heard what she believed to be a "ping on

---

[6] Because Theresa Dill and Brittany Dill share the same surname, we refer to Theresa Dill by her first name.

the utility box out front" from a gunshot, and she saw appellant standing outside the house where the shots seemed to be coming from. She then saw Mr. Lee grab his gun, and she heard him fire two shots from the front door. Her daughter took the children upstairs, and Theresa watched the surveillance footage being displayed on the television in the living room. She saw what appeared to be Mr. Holland "running through . . . clutching a gun." She then heard gunshots hitting the house. She moved toward the front of the house where she thought it would be safe, but she then saw a man at the residence get shot in the hallway.

The children came downstairs after the shooting stopped. One child was screaming that he had been shot, but he did not have any injuries. A.M. came downstairs limping and "in shock . . . he wasn't the same." A neighbor took A.M., and then police officers treated him until he was transported to the hospital. Theresa testified that gunshots hit an upstairs window in the house, but she could not independently confirm which window was hit because she was not upstairs when the gunshots were fired. She knew, however, that A.M. was in a "back room" and then a "teal room in the front," both of which were on the second floor of the house.

Theresa viewed video footage from the surveillance cameras at the residence and identified the individuals shown. The footage showed appellant's brother, Mr. Holland, running from the back of the house to the front of the house. Appellant, one of his brothers, and his mother also appeared, and the video showed appellant holding what appeared to be a gun in his hand. On cross-examination, Theresa stated that, at the time of the shooting, she did not see appellant shoot a gun while running through the "cut" between the Huntsman Drive residence and the neighboring house.

8

Naomi Lynn Poore testified that she was a resident of Hollingsworth Manor and was at home at the time of the shooting. She heard gunshots and ran to her back window, where she observed Mr. Sayers and another, unidentified man "running in front of him in all dark clothes," and carrying what appeared to be a large gun similar to an assault rifle. Both men ran from "where the shooting had occurred," toward Cow Lane. Mr. Sayers had a dark-colored backpack, "[a]nd there was something he was passing out, and people would come and go and rush, but [she] couldn't tell what he was passing out." Ms. Poore's house previously had been damaged when gunshots hit her house, but the police identified damage from a "fresh gunshot" that "triangulates with the area where" the shooting occurred.

Officer Mlodzianowski responded to the scene at Huntsman Drive at 3:30 p.m. and saw A.M. on the ground with "a large size hole in the child's left knee cap." He rendered aid, applying pressure to the wound until EMS workers arrived. He was then instructed to collect Mr. Sayers, who had been found on Cow Lane, and bring him to the Elkton Police Department. Officer Mlodzianowski transported Mr. Sayers and searched his person, leading him to find "approximately eighteen bags of suspected heroin fentanyl mix," some marijuana, and several hundred dollars in cash. Officer Mlodzianowski sealed the items as evidence, and they were sent to the Maryland State Police Crime Lab.

Detective Ziegenfuss testified that she responded to assist other investigators at the Huntsman Drive residence on May 11, 2020. At 9:15 p.m., Detective Ziegenfuss and five other officers executed a search warrant for appellant's house on Cow Lane. In the laundry room, she found a box, hidden inside an extra-large size jacket, containing several bundles

9

of suspected heroin or fentanyl stamped with "Cash [A]pp and Donald Trump," suspected marijuana, suspected methamphetamine or crack cocaine, and several hundred dollars in cash. She subsequently interviewed appellant at the police department, after he waived his *Miranda* rights. Appellant denied that still photographs that were produced from the surveillance footage at Huntsman Drive showed him, his brothers, or his mother near the residence or in the "cut" leading to Cow Lane. Following the interview, appellant was in the booking area to be processed, and Detective Ziegenfuss told appellant "that the six-year-old child would survive, and that he was lucky that he wasn't going to be charged with a murder charge." Appellant responded: "Fuck that six-year-old. I don't give a fuck about him. I'm sorry. I don't give a fuck about him."

Detective Beamer arrived at the Huntsman Drive residence at 3:15 p.m. and noticed what appeared to be bullet holes in the house and broken glass from the windows. Inside the residence, he found bloody clothing, a .22 caliber semi-automatic rifle, and .22 caliber shell casings. There were five bullets in the walls of the home; one hit the hot water heater, another hit the studs in one of the walls on the first floor, and three more hit the second floor, where Detective Beamer also noticed holes in a window, "on the left side of the house from the front," facing Cow Lane.

Detective Beamer subsequently went to Cow Lane to assist with executing the search warrant for appellant's house. He searched the left front bedroom and found "a partial box of .25 caliber ammunition," "a partial box of .380 ammunition inside of a zippered pocket of a jacket," "several loose 7.62 by 39 caliber rounds," "a baggie containing several .22 caliber rounds," a "single 40 S&W round," and a wallet containing

10

appellant's identification. Detective Beamer stated that, to his knowledge, .25 caliber bullets are only used for handguns, whereas 7.62 by .39 caliber bullets are used for certain types of rifles. Detective Beamer also found a magazine for a "black Walther handgun," and he stated that another officer found a box for that same type of handgun. When asked to describe a still photo taken from the surveillance video at Huntsman Drive, Detective Beamer said that the photo showed appellant holding what appeared to be a handgun. On May 13, 2020, Detective Beamer returned with Sergeant Odom to search the area around the Cow Lane residence and found "one live 7.62 by 39 round, and . . . five empty shell casings of the same caliber," next to a shed on the property that faced the Huntsman Drive residence. He stated that the Cow Lane residence was "to the left and diagonal to the rear" of the Huntsman Drive residence, and shell casings usually discharge "to the right and rearward of the shooter."

Sergeant Ronald Odom testified that, when he reported to Huntsman Drive at 4:00 p.m. on May 11, 2020, "[i]t was pretty chaotic, people screaming and crying." The back of the house "was riddled with bullet holes, everywhere from the ground floor up to the second floor."

When Sergeant Odom returned two days later, he and Detective Beamer searched for more shell casings. Detective Beamer recovered multiple shell casings by the shed, and found a live rifle round in the grass, which he identified as a 7.62 caliber bullet for a high powered rifle. One of the photos of where the shell casings were found showed "the vantage point of where someone would be standing firing a gun where those shell casings would land" at the Huntsman Drive residence. The State then showed Sergeant Odom a

11

still image taken from surveillance footage at Huntsman Drive, and he stated that the photo showed appellant holding what appeared to be a handgun, specifically a "semiautomatic pistol."

Detective Comley testified that, on May 11, 2020, she wrote and served the search warrant for Cow Lane. The officers did not find any firearms inside the house.

On May 19, 2020, Detective Comley returned to search the area adjacent to Cow Lane. She met with ATF Special Agent Hodnett and his K-9, who was trained to "scan for the smell of firearms or items related." The K-9 alerted to eight shell casings, including five .38 shell casings near a shed, one .25 caliber shell casing, and two 7.62 by .39 shell casings, all located in the grassy area adjacent to the Cow Lane residence. Detective Comley took photographs, collected each shell casing, and marked their locations.[7]

The State presented surveillance footage from Huntsman Drive and asked Detective Comley to describe what she saw. At 2:52 p.m., the front door was closed. Then, there were two "puffs of smoke" from what she believed were gunshots, because "when a gun is fired it creates a puff of smoke because of the explosion." At 2:45 p.m., appellant pulled out of his pocket what appeared to be a handgun. At 2:54 p.m., the footage revealed that Cody Hammond and appellant were walking around. At 2:56 p.m., she saw a person whom she believed to be appellant "standing in a firing stance that would be indicative of someone holding a long gun." The surveillance camera reflects debris falling from the house

---

[7] Sergeant Odom testified that the ammunition recovered inside of the Cow Lane residence had a "head stamp," or label, of "Federal .380 Auto," the same as the ammunition that Detective Comley found near the shed.

12

seconds later. Detective Comley then saw "[t]wo puffs of smoke coming from the window."

Heather Baxivanos, a forensic scientist for the Cecil County State's Attorney's Office, testified as an expert in forensic chemistry. Based on her analysis of 42 blue wax bags in small zip-lock bags, with "Donald Trump" stamps on them, and 32 blue wax bags in small zip-locks bags, with "Cash App" stamps on them, it was her opinion, to a reasonable degree of scientific certainty, that the 42 wax bags with "Donald Trump" stamps contained methamphetamine, and the 32 wax bags with "Cash App" stamps contained fentanyl.

Officer Michael Dowling, an expert in the identification, packaging, and distribution of controlled substances, testified that he was aware of appellant's statement that he used and sold drugs. He believed that the wax bags recovered at the Cow Lane residence were for distribution.

Kelly Sexton, a crime scene technician for the Maryland State Police, testified as an expert in crime scene processing related to bullets and bullet trajectories. She responded to Huntsman Drive on May 26, 2020, for the purpose of documenting and measuring "projectile holes." She took photos of the scene and prepared a report with notes and sketches of her measurements, which the court admitted into evidence. She explained that she documented 13 projectile holes and recorded the "measurements, angles of the elevation, and horizontal angle for each of the bullet holes." She identified several holes found in a "teal bedroom" on the upstairs level and confirmed that, with respect to several

13

of the holes on both levels, the trajectories of the holes indicated pathways leading from the back, northeast corner of the house.

The parties then delivered closing arguments. The State argued that the circumstantial evidence demonstrated that appellant had a firearm, and the "level of violence" in this case showed that appellant committed an assault, causing serious injury to A.M.

Appellant argued that, based on the surveillance footage, it was Mr. Lee who fired the first shots, prompting appellant to return fire "within seconds of being shot at" as a form of self-defense. Further, with respect to appellant and his brothers, "there's reasonable doubt about whether or not they're standing their ground over there . . . you have an issue within seconds of being shot at and they didn't start it. They didn't even shoot back when they were going through the cut."

On rebuttal, the State argued that (1) appellant presented no evidence of self-defense, (2) Maryland does allow a defendant to assert a "stand your ground" defense, and (3) a defendant may not assert self-defense after using deadly force or initiating the confrontation. Here, appellant and his brothers "shot at will at that house without any regard for anybody in there, and at the end of the day the person that paid the price was [A.M.] because he's the one now who for the rest of his life will have a hole in his knee."

In announcing its verdict, we note that, as relevant to this appeal, the court stated that the surveillance footage of the shooting did not clearly indicate who shot first or show where the first bullet was directed. It was clear, however, that appellant displayed "what appears to be a handgun, and the [c]ourt's kind of determined I think that through the

14

totality of the circumstances it is." The court noted that the footage showed "them making their way through the cut and picking up their pace, and then that's when we start seeing puffs," but it was not clear from where they were coming. Appellant and his brothers disappeared "behind the shed," and the Huntsman Drive residence ultimately was "riddled with bullets." The court reiterated that it could not confirm

> where these shots came from, but you got them going through the cut, at least one armed, two armed, and at one point there's something happening, I don't even know what's going on, because I'm not going to say specifically that Cody did something because I can't tell, but I saw some gesture, I don't know what was going on, he made a particular gesture toward the house before everybody started running . . . . So I ask the question, when they made it away, if the shots were coming there, why at that point exchange fire, and a great deal of fire? Two times the amount of shots that were even fired from the house. And that just was an overabundance, even if I find that there was some minor justification, there wasn't that much justification.

The court continued, stating that, considering "the totality of the circumstances with the ammunition found, with the damage done, with seeing him with the handgun, with the racking the slide, I believe there's enough to show that there was a firearm present." The court found that there was sufficient evidence beyond a reasonable doubt to support appellant's conviction of first-degree assault and second-degree assault. It stated that second-degree assault would merge into first-degree assault.[8]

---

[8] The court did not elaborate on the basis for its findings of assault. In denying the motion for judgment of acquittal on these charges, however, the court noted that a conviction of second-degree assault required "harmful or offensive touching or placing someone in fear of harmful or offensive touching." It stated:

> We have the obvious injury to the minor. Serious injury to the minor. So we have that part. We have an offensive touching, harmful touching. We have the actions of the defendant and co-defendants which the [c]ourt believes is

With respect to conspiracy, the court found appellant not guilty, stating: "I don't think there is an agreement to assault this young boy. There's an agreement to shoot the house up and he got assaulted within that, but I don't believe that there was necessarily any agreement to shoot him."

This appeal followed.

## DISCUSSION

## I.

## Jury Trial Waiver

Appellant's first contention involves the propriety of his waiver of his right to a jury trial. The right to a jury trial is guaranteed by the Sixth Amendment of the United States Constitution and the Maryland Declaration of Rights. *See* U.S. Const. amend. VI, XIV § 1; Md. Decl. of Rts. art. 5, 21, 24. A defendant can waive this right, however, and elect to be tried by the court. *Boulden v. State*, 414 Md. 284, 294 (2010).

Maryland Rule 4-246(b) implements this constitutional right and sets forth the procedure to accept a jury trial waiver. It provides:

> A defendant may waive the right to a trial by jury at any time before the commencement of trial. The court may not accept the waiver until, after an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, the court determines and announces on the record that the waiver is made knowingly and voluntarily.

---

sufficient to show that the actions of shooting large number of rounds into the home is intent . . . . [T]here is intent, and the actual injury was inflicted upon [A.M.], so I believe second degree assault exists.

16

Appellant contends that the circuit court violated his constitutional right to a jury trial because it failed "to ensure that he knowingly and voluntarily waived his right to a jury trial." Specifically, he asserts that the court's examination was "wholly insufficient as to whether he voluntarily waived his right to a [jury] trial." Additionally, he argues that the court "failed to expressly determine and announce on the record *any* findings that [appellant's] purported waiver was made knowingly and voluntarily."

## A.

### Proceedings Below

The parties appeared at a pretrial hearing the day before trial. After a discussion about *voir dire* questions for the venire, the court took a brief recess, and the following then occurred:

> THE COURT: All right. We are back on the record for the Hammond case. The court – what I'm going to do is I'm going to recess – I'm going to make some decisions in the morning. But what I need to also address though is, Mr. Richitelli, your client's interest or lack of interest in a trial by jury. What's your -- what's your intentions of tomorrow?
>
> MR. RICHITELLI: We just decided to go with a bench trial, your honor, without a jury.
>
> THE COURT: All right. So, Mr. Hammond, you understand you have the right to have trial by jury. A jury is twelve people. They'd hear the case. You can do that. The jury would hear all — the [S]tate has the burden of proof, proof beyond a reasonable doubt. They present the evidence. They would present the evidence to the jury; and end of the day, the primary difference between a judge trial and a jury trial is those twelve have to make a unanimous decision as to your — you being guilty or not guilty as to each count. If they can't all agree it's something called a hung jury. If it's a mistrial you can be tried over again with a different jury until you have a jury that agrees; versus that one person who hears it, and then I'll make a decision as to each count, if you were guilty or not. Do you agree to waive that right to have a trial by jury and be heard by a judge?

THE DEFENDANT: Yeah.

THE COURT: All right. So the court will note the jury waiver.

## B.

## Rule 4–246(b)

Appellant contends that the court erred in failing to comply with the requirement of Rule 4-246(b) that it announce on the record its determination that the waiver was made knowingly and voluntarily. The State contends that this issue is not preserved for this Court's review because there was no objection below.

As indicated, Rule 4-246(b) clearly states that a court may not accept a jury trial waiver until it "determines and announces on the record that the waiver is made knowingly and voluntarily." There is no dispute that the court failed to comply with that aspect of the rule in this case.

To challenge a failure to comply with Rule 4-246(b) on appeal, however, there must be an objection raised in the trial court. *Nalls v. State*, 437 Md. 674, 693 (2014) (the appellate courts will "review the issue of a trial judge's compliance with Rule 4-246(b) provided a contemporaneous objection is raised in the trial court to preserve the issue for appellate review."). *Accord Spence v. State*, 444 Md. 1, 14–15 (2015) ("We made it perfectly clear in *Nalls* that a claimed failure of the court to adhere strictly with the requirements of Rule 4-246(b) requires a contemporaneous objection in order to be challenged on appeal."); *Meredith v. State*, 217 Md. App. 669, 674, *cert. denied*, 440 Md. 226 (2014) (*Nalls* made it "loud and clear that a contemporaneous objection in the trial

court is a necessary predicate for appellate review" of a "trial court's compliance with Rule 4–246(b).").

Appellant concedes that no objection was made to the court's failure to announce on the record its determination that the waiver was knowing and voluntary. Recognizing that an objection is required to preserve an argument that the court failed, pursuant to Rule 4-246(b), to announce on the record that it had determined that the waiver was knowing and voluntary, appellant requests this Court to exercise its discretion to review the issue. *See* Md. Rule 8-131(a) (An appellate court ordinarily will not decide an "issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.").

We decline to address this unpreserved issue. It is not a new issue; as indicated, the requirements of the Rule have been discussed in multiple cases. If an objection had been raised below, the court easily could have corrected the error. *See Ray v. State*, 206 Md. App. 309, 351 (2012) (declining to exercise discretion to review an unpreserved issue where the court's error "'was one that might have been readily corrected if it had been called to the trial [court]'s attention.'") (cleaned up), *aff'd*, 454 Md. 563 (2017). We agree with the sentiment expressed in Justice Watts' concurring and dissenting opinion in *Nalls*, i.e., to extend discretion to this type of case would be "to the detriment of the requirement that defense counsel lodge objections and preserve for appellate review easily identifiable issues such as this." *Nalls*, 437 Md. at 700–01 (Watts, J., concurring in part and dissenting

in part). To the extent that appellant believes that relief is warranted, he must seek such relief through post-conviction proceedings.

## C.

### Knowing and Voluntary Waiver

Appellant next contends that the court violated his constitutional right to a jury trial because the court failed to ensure that his waiver of this right was knowing and voluntary. Unlike a claim that the procedure in Rule 4-246(b) was not followed, a claim of a constitutional violation of the right to a jury trial does not require an objection to preserve the claim. *Biddle v. State*, 40 Md. App. 399, 407 (1978) (rejecting State's preservation argument in the context of a jury trial waiver because "[a] waiver of a constitutional right must appear affirmatively in the record."). *Accord Robinson v. State,* 410 Md. 91, 107 (2009) (right to a jury trial is "absolute and can only be foregone by the defendant's affirmative 'intelligent and knowing' waiver"); *McElroy v. State*, 329 Md. 136, 140 n.1 (1993) (fundamental constitutional rights requiring an intelligent and knowing waiver include the right to a trial by jury). Thus, we will address this claim on the merits, despite the lack of an objection below.

As indicated, a constitutionally valid waiver of the right to a jury trial must be knowing and voluntary; it must be "an intentional relinquishment or abandonment of a known right or privilege." *Aguilera v. State*, 193 Md. App. 426, 431 (2010) (quoting *Walker v. State*, 406 Md. 369, 378 (2008)). There is no "fixed incantation" required, but the court must "satisfy itself that . . . the defendant has some knowledge of the jury trial right before being allowed to waive it." *State v. Hall*, 321 Md. 178, 182–83 (1990) (quoting

and citing *Martinez v. State*, 309 Md. 124, 134 (1987)). "Whether there is an intelligent, competent waiver must depend on the unique facts and circumstances of each case." *Valiton v. State*, 119 Md. App. 139, 148, *cert. denied*, 349 Md. 495 (1998). If the record "does not disclose a knowledgeable and voluntary waiver of a jury trial, a new trial is required." *Smith v. State*, 375 Md. 365, 381 (2003).

Considering the totality of the circumstances, we conclude that the record shows that appellant knowingly and voluntarily waived the right to a jury trial. The court advised appellant of his right to have a trial by jury, which "is twelve people" who would have to make a unanimous decision that he was guilty beyond a reasonable doubt. If he waived that right, the court, as one person, would decide if he was guilty or not. At the end of the court's advisement, appellant indicated that he wanted to waive his right to a jury trial and be tried by the court.

The Supreme Court of Maryland upheld a waiver based on a similar colloquy in *Hall*, 321 Md. at 183.[9] In that case, the court

> advised [Hall] of his right to a jury trial "where twelve people would hear the evidence," all of whom would have to be convinced beyond a reasonable doubt before he could be found guilty. The court advised Hall that if he waived his right to a jury trial, the court would hear the evidence and have to be convinced beyond a reasonable doubt before he could be found guilty. At the end of this colloquy, the trial judge asked Hall whether he wanted to be tried by jury or by the court, to which Hall answered: "Tried by the Court."

*Id.* The Supreme Court upheld the waiver, stating:

> While the court did not specifically ask Hall whether he understood what he had been told, or whether his election of a court trial was the result

---

[9] On December 14, 2022, the name of the Court of Appeals was changed to the Supreme Court of Maryland.

of any physical or mental duress or coercion, we think that the record before us demonstrates that the court could fairly be satisfied that Hall had the requisite knowledge of the jury trial right, that the waiver was voluntary, and that the requirements of the rule were satisfied.

*Id.*

Moreover, as in *Hall*, the record reflects that appellant discussed the waiver of his right to a jury trial with his counsel. Counsel stated, after a recess following discussion of proposed *voir dire*, that "we just decided to go with a bench trial . . . without a jury." We may presume, when an attorney states in court that the defendant wants to waive the right to a jury trial, that the attorney has advised of the advantages and disadvantages of having the case evaluated by a judge instead of a jury. *Kang v. State*, 163 Md. App. 22, 36 (2005) ("[W]e may presume that criminal defendants represented by counsel have been informed of their constitutional rights," including the right to a jury trial), *aff'd*, 393 Md. 97 (2006).

Indeed, appellant does not press an argument that the waiver was not made knowingly. Instead, he argues that the court's inquiry was "wholly insufficient" as to the voluntariness requirement. He argues that the court made no inquiry into whether his "decision to waive his right to a jury trial [was] of his own free will, uncoerced, and uninfluenced by drugs or alcohol." We have explained that a "court is not required to ask questions regarding voluntariness, absent a factual trigger bringing into question the voluntariness of the waiver. Rather, in the absence of a trigger, the court is permitted to make its voluntariness determination based on the defendant's demeanor, without asking any specific questions about voluntariness." *Aguilera*, 193 Md. App. at 442. *Accord Kang*, 393 Md. at 110.

Appellant contends that his waiver colloquy was insufficient because there were "two critical 'factual triggers' that should have prompted the trial court to inquire that [he] was not under the influence of drugs or alcohol such that his free will was not impaired." Those triggers included that: (1) he was charged with drug offenses in this case; and (2) he had a criminal history of drug-related issues. Counsel for appellant indicated in oral argument that, in any case where the defendant has been charged with drug offenses or had a history of drug-related offenses, the court is required to ask specific questions regarding the voluntariness of a jury trial waiver.

We disagree. Prior involvement in drug-related offenses does not, by itself, constitute a factual trigger requiring a specific inquiry into the voluntariness of the waiver.

Here, the judge was able to observe the appellant's demeanor. *See Abeokuto v. State*, 391 Md. 289, 321 (2006) (defendant's waiver of a jury trial was knowing and voluntary because his behavior did not indicate that he had been coerced or forced, and his defense counsel had advised him about his right to a jury trial prior to the waiver); *Hall*, 321 Md. at 183–84 ("defendant's demeanor, tone, facial expressions, gestures, or other indicia . . . may be indicative of a knowing and voluntary waiver of the jury trial right."). There is nothing in the record to suggest that appellant's demeanor was of concern or should have prompted the court to ask more specific questions regarding the voluntariness of appellant's waiver of his right to a jury trial. The record here was sufficient to support the court's conclusion that appellant's jury trial waiver was knowing and voluntary.

## II.

## Sufficiency of the Evidence

Appellant's next contention is that there was insufficient evidence to support his convictions for first-degree assault and second-degree assault. In support, he argues that there was insufficient evidence to show that: (1) he caused A.M.'s injury; and (2) he had the requisite intent to support the convictions.

The State contends that the evidence was sufficient to support appellant's assault convictions. It asserts that the evidence permitted the court to find that, "as a result of the barrage of gunfire that [appellant] and his brother directed at" the house, the house was "riddled with bullets." Based on the broken windows and bullet holes in the house where A.M. was shot, the court could infer that appellant, using a firearm, assaulted A.M., causing serious injury. With respect to intent, the State argues that the evidence supported a reasonable inference that appellant "was aware that people were in the house when he and his brothers fired upon it," noting that appellant's "assertion of self-defense was his express acknowledgement that he was aware that at least one person was in the house." Even if appellant did not target a particular victim, he had intent to place everyone in the home in the "zone of danger" and put them in "fear of immediate physical harm."

The test for legal sufficiency of evidence is whether any rational fact finder could find "the essential elements of the crime beyond a reasonable doubt." *State v. Morrison*, 470 Md. 86, 108 (2020) (quoting *State v. Coleman*, 423 Md. 666, 672 (2011)). On review of a criminal bench trial, we review "the law and the evidence to determine whether in law the evidence is sufficient to sustain the conviction, but the verdict of the trial court shall

24

not be set aside on the evidence, unless clearly erroneous." *Rivera v. State*, 248 Md. App. 170, 178–79 (2020) (quoting *Williams v. State*, 5 Md. App. 450, 454 (1968), *cert. denied*, 252 Md. 734 (1969)).  Moreover,

> [t]he Court's concern is not whether the verdict is in accord with what appears to be the weight of the evidence, but rather is only with whether the verdicts were supported with sufficient evidence — that is, evidence that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offense charged beyond a reasonable doubt. We must give deference to all reasonable inferences [that] the fact-finder draws, regardless of whether [the appellate court] would have chosen a different reasonable inference. Further we do not distinguish between circumstantial and direct evidence because [a] conviction may be sustained on the basis of a single strand of direct evidence or successive links of circumstantial evidence.

*DeGrange v. State*, 221 Md. App. 415, 420–21 (2015) (quoting *Donati v. State*, 215 Md. App. 686, 718, *cert. denied*, 438 Md. 143 (2014)).

Pursuant to Md. Code Ann., Crim. Law Art. ("CR") § 3-203 (2021 Repl. Vol.), which addresses second-degree assault, a "person may not commit an assault."  Second-degree assault "encompasses three modalities: (1) intent to frighten, (2) attempted battery, and (3) battery." *Snyder v. State*, 210 Md. App. 370, 382, *cert. denied*, 432 Md. 470 (2013).  Second-degree assault is elevated to first-degree assault when there is an aggravating factor, including, as relevant here: (1) "intentionally causing or attempting to cause serious physical injury"; or (2) "committing an assault with a firearm."  CR § 3-202 (2020).

Appellant contends that there was insufficient evidence to show that he fired the shot that injured A.M.  It is true that the evidence did not show that the bullet that hit A.M. was fired by appellant, and therefore, there was insufficient evidence to show appellant was guilty of the battery variety of assault.  *See Koushall v. State*, 479 Md. 124, 150 (2022)

("the common law elements of assault in the second degree of the battery variety are (1) the unlawful, (2) application of force, (3) to the person of another."). As indicated, however, there are other varieties of second-degree assault.

The "intent to frighten" type of assault requires "that the defendant commit an act with the intent to place another in fear of immediate physical harm, and the defendant had the apparent ability, at that time, to bring about the physical harm. The victim must be aware of the impending battery." *Snyder*, 210 Md. App. at 382. "[I]t is not necessary that the victim be actually frightened or placed in fear of an imminent battery." *Lamb v. State*, 93 Md. App. 422, 437 (1992), *cert. denied*, 329 Md. 110 (1993). The victim, however, must be placed "in reasonable apprehension of an impending battery." *Id.* at 437–38 (quoting W. Prosser and P. Keeton, *The Law of Torts* (5th ed. 1984)).

The attempted battery type of second-degree assault requires that the evidence show: (1) that the defendant took a substantial step to cause injury; and (2) that he had a "specific intent to cause physical injury to the victim." *Snyder*, 210 Md. App. at 382. The victim need not be aware of the impending battery. *Id.*

The State contends that the evidence was sufficient to prove either of these two types of assault. Only one is required to uphold the conviction, however, and as explained below, we hold that the evidence was sufficient to support a conviction for the intent to frighten type of assault.

We find the analysis in *Jones v. State*, 440 Md. 450, 458 (2014), to be helpful. In that case, Jones fired three gunshots through the front door of an apartment occupied by multiple people. Before the shooting, he knocked on the door and indicated to one of the

26

residents, Ms. Tindley, that he was looking for two other males. *Id.* Ms. Tindley closed the door and told another person in the apartment, Ms. Johnson, that the defendant had a gun. Jones argued that the evidence was insufficient to support his conviction of second-degree assault of Ms. Johnson, based on an intent to frighten modality, where there was no evidence that he knew she was in the house. *Id.* at 454. The Supreme Court affirmed the conviction, stating:

> Where a defendant intentionally commits an act that creates a zone of danger, and where the defendant knows that multiple people are in the zone of danger, the defendant intends to place **everyone** in the zone of danger in fear of immediate physical harm—even if the defendant does not know of a particular victim's presence in the zone of danger.

*Id.* at 456 (emphasis in original). The Court stated that, where "Jones intentionally fired a gun three times, and at least two bullets entered the apartment," Jones "turned the apartment into a zone of danger," and he "intended to place everyone in the zone of danger in fear of immediate physical harm—even if Jones did not know of Johnson's presence in the zone of danger." *Id.* at 458.

Similarly here, the evidence supported the court's findings that appellant approached the home with a gun, and he and his brothers shot a "large number of rounds into the home." Video footage, pictures, and testimony showed that appellant was holding what appeared to be a handgun moments before gunfire began to hit the house, and he took a firing stance facing the house at the same time that debris fell from the house. The police found ammunition at appellant's residence, in a box containing his identification, and shell casings near the shed outside of the Cow Lane residence that were of the same caliber as those found inside the residence. Ms. Sexton testified that the trajectory from the bullet

holes at the Huntsman Drive residence showed that the bullets struck "the back rear corner or the northeast corner," i.e., the side of the Huntsman Drive residence that faced the shed on Cow Lane, where appellant was seen just before the gunfire occurred.

By participating in actions that resulted in a barrage of gunfire penetrating the house, appellant created a zone of danger to all the residents in the home. He intended to place everyone in the house in fear of imminent physical harm. [10] The evidence was sufficient to support appellant's conviction for the intent to frighten assault.

With respect to the conviction for first-degree assault, appellant does not dispute that there was a statutory aggravating factor here. Appellant used a firearm and A.M. suffered a serious, physical injury. *See* § CR 3-202(b). Appellant's only contention with respect to first-degree assault is that, because the evidence was insufficient to support his conviction of second-degree assault, the evidence was insufficient to support his conviction of first-degree assault. Because we have rejected his contention that the evidence was insufficient to support his conviction for second-degree assault, we reject his sufficiency claim regarding first-degree assault as well.

**JUDGMENTS OF THE CIRCUIT COURT FOR CECIL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

[10] The evidence permitted the finder of fact to infer that appellant knew that people were in the house at the time of the shooting: Ms. Dill and Mr. Lee were standing outside of the front door of the Huntsman Drive residence moments prior to the shooting. Moreover, appellant told the police that Ms. Dill "takes care of her kids. She lives at the house. She don't do nothing," suggesting his belief that she and her kids were likely at home at the time of the shooting.